OPINION *Page 2 
{¶ 1} Defendant-appellant Heather Cagey appeals her conviction and sentence from the Alliance Municipal Court on one count of telecommunications harassment. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On April 5, 2007, appellant was cited for telecommunications harassment in violation of R.C. 2917.21(B) and aggravated menacing in violation of R.C. 2903.21, both misdemeanors of the first degree. With respect to the charge of telecommunications harassment, the complaint alleged that appellant "threatened to have kept calling Mary Detweiler and harassing her and her family making threats about calling children services and taking Mary's children away. Heather [appellant] also told Mary if she called police, she was going to kill her." With respect to the charge of aggravated menacing, the complaint alleged that appellant threatened to kill Mary Detweiler if Mary called the police about the harassing telephone calls and also told Mary that she wished she would die and that "if not she would make it happen." At her arraignment on April 25, 2007, appellant entered a plea of not guilty to the charges.
 {¶ 3} Subsequently, a jury trial commenced on August 30, 2007. The following testimony was adduced at trial.
 {¶ 4} Mary Detweiler is appellant's mother. Mary Detweiler testified that on April 5, 2007, appellant kept calling her house and that appellant called seven or eight times that night. She testified that there were at least two separate incidences. The first series of telephone calls were during the day and were taken by Benjamin Detweiler, appellant's stepfather. Mary Detweiler testified that between 11:00 p.m. and 1:30 a.m. *Page 3 
on April 5, 2007, appellant called seven or eight times and that, during the telephone calls, appellant yelled and screamed and threatened her. According to Detweiler, appellant threatened to put her in a mental hospital and to report her to the Department of Human Services. When asked what appellant said during the series of telephone calls, Mary Detweiler testified that appellant "called me a fuck'n bitch. She said she'd make sure my kids were taken away from me." Transcript at 66. Detweiler further testified that appellant threatened to kill her during the telephone calls. She further testified that she perceived appellant's calls as threatening, harassing and abusive.
 {¶ 5} The following testimony was adduced when Mary Detweiler was asked how she dealt with the series of calls:
 {¶ 6} "A. Well, I would just — when it would ring, I'd pick it up and hang it up. Ring, pick it up and hang it up. And one time again after I did that several times, I answered it and said, `Would you please just quit calling. Daddy has to get up for work in the morning.'
 {¶ 7} "Q. Ultimately, did — what did you do with the telephone itself?
 {¶ 8} "A. I don't remember, I think Benjie went out and unplugged it that particular night. I'm thinking that's what he did just to get rest. Which is bad because we — he had elderly parents and we like to keep our phone lines open for any emergencies. But since both younger children was (sic) at home, I didn't feel so bad unconnecting (sic) the phone." Transcript at 69.
 {¶ 9} Mary Detweiler went to the police department to make a report that evening. *Page 4 
 {¶ 10} Benjamin Detweiler, appellant's step-father and Mary Detweiler's husband, testified that during the twenty four hours surrounding April 5, 2007, he received a number of telephone calls on two separate occasions from appellant. He testified that during the early evening, he received a half dozen calls originating from his father's house where appellant was helping out. While he was unable to recall if he answered the telephone every time or if his wife answered, he remembered overhearing vulgar language. Benjamin Detweiler further testified that, between 11:00 p.m. and 1:30 a.m., when he was trying to sleep, appellant called five or six times. He testified that he got up at 3:30 a.m. to be at work by 5:00 a.m. According to Benjamin Detwiler, his wife put the telephone on the bed between them and he was able to hear appellant swearing and cussing.
 {¶ 11} Benjamin Detweiler testified that "we would hang up and then as soon as Maria [Mary Detweiler] would hang up the phone, the phone would ring again. And it got to a point after the fifth or sixth call, I jut got up and unplugged the telephone on the other side of the bed. And when the phone rang, it rang in the living room and the answering machine, left the answering machine on and it picked up the calls . . ." Transcript at 94-95.
 {¶ 12} Appellant took the stand in her own defense. She denied making the calls and testified that her mother, Mary Detweiler, had severe mental problems. She testified that she was removed from her mother's custody when she was eleven (11) years old and that the two had a difficult relationship. Appellant testified that, on April 5, 2007, she was with her friend, Jennifer, and did not make the calls. She testified that both Mary and Benjamin Detweiler were liars and that she was the "stable" member of her *Page 5 
family. On cross-examination, appellant admitted that she previously had been arrested for domestic violence and had pleaded to a reduced offense and that she once took an entire bottle of Tylenol.
 {¶ 13} At conclusion of the evidence and the end of deliberations, the jury, on August 30, 2007, found appellant guilty of telecommunications harassment but not guilty of aggravated menacing. On the same date, appellant was ordered to serve 30 days in jail, with fifteen (15) of the days suspended, and ordered to pay a fine in the amount of $250.00.
 {¶ 14} Appellant now raises the following assignment of error on appeal:
 {¶ 15} "I. APPELLANT'S CONVICTION FOR TELECOMMUNICATIONS HARASSMENT WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 16} "II. APPELLANT WAS DENIED HER SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 I {¶ 17} Appellant, in her first assignment of error, argues that her conviction for telecommunications harassment is against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 18} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would *Page 6 
convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 19} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 20} Appellant was charged with violating R.C. 2917.21(B), which provides: "(B) No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse, threaten, or harass another person."
 {¶ 21} Appellant contends that she did not make the telephone calls on April 5, 2007, and that there was no direct evidence, such as telephone records, that established that she did. She also argues that there was no evidence or testimony that *Page 7 
she made the calls with the purpose to abuse, threaten or harass anyone. Appellant also notes that her mother testified that a number of the phone calls "where she lifted the phone up and hung up" and that the telephone calls were always blocked.
 {¶ 22} However, upon our review of the record, we find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant committed the offense of telecommunications harassment. Both Mary Detweiler and Benjamin Detweiler testified that, between 11:00 p.m. and 1:30 a.m., appellant, whose voice they recognized, made a series of telephone calls to their home. Mary Detweiler testified that appellant used vulgar language during the calls and threatened to put her in a mental hospital and to report her to the Department of Human Services. In addition, testimony was adduced that Mary Detweiler at times simply hung up the phone and did not speak to appellant, but that appellant continued calling. Mary Detweiler testified that she asked appellant to quit calling because her husband had to get up early in the morning for work, but that the calls continued. We note that there does not need to be direct evidence of a defendant's intent to annoy or harass when the circumstances surrounding the calls tend to show such. State v.Lucas, Belmont App. No. 05 BE 10, 2005-Ohio-6786, at ¶ 15. We find that appellant's repeated telephone calls containing vulgar and threatening language tend to show that appellant's purpose was to abuse, threaten, or harass. Moreover, Mary Detweiler testified that she perceived the calls as threatening, harassing and abusive.
 {¶ 23} We further find that the jury, in convicting appellant, did not lose its way so as to create a manifest miscarriage of justice. Appellant's conviction, therefore, was not against the manifest weight of the evidence. *Page 8 
 {¶ 24} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 25} Appellant, in her second assignment of error, argues that she received ineffective assistance of trial counsel.
 {¶ 26} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a twopronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. at 141-142. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie,81 Ohio St.3d 673, 675, 1998-Ohio-343, 693 N.E.2d 267.
 {¶ 27} Appellant specifically contends that her trial counsel was ineffective in failing to subpoena a witness and in failing to object to the State's questioning in regard to appellant's character.
 {¶ 28} In the case sub judice, appellant testified that she was with her friend Jennifer on April 5, 2007, and she did not make any of the alleged telephone calls. After *Page 9 
appellant testified, her counsel called Jennifer to the stand, but was informed by the bailiff that he was unable to locate her. After the court waited twenty (20) minutes to see if Jennifer appeared, appellant's counsel moved for a continuance stating, in relevant part, as follows:
 {¶ 29} "We would just move for the record, a motion to continue for Jennifer Bome. She was present this morning. She was here all morning, prepared to testify. I've received a note. We've discussed this on the record, prior to coming to on, that she had to leave, and she — I did contact her by phone. She's not able to be back at this point in time." Transcript at 140.
 {¶ 30} After appellee objected to a continuance, noting that appellant's counsel had not subpoenaed Jennifer, the trial court denied the motion for a continuance.
 {¶ 31} An attorney's failure to subpoena witnesses is within the realm of trial tactics and does not, absent a showing of prejudice, constitute ineffective assistance of counsel. State v. Hunt (1984),20 Ohio App.3d 310, 311, 486 N.E.2d 108, citing State v. Hester (1976),45 Ohio St.2d 71, 341 N.E.2d 304. While appellant contends that her attorney's failure to subpoena Jennifer was prejudicial, other than appellant's assertions, there is no evidence as to how such witness would have testified if subpoenaed. See, for example, State v. Crystal Lake (June 29, 1999), Ashland App. No. 98-COA-0127, 1999 WL 547448. We find, therefore, that appellant has not met the first prong of the test set forth inStrickland.
 {¶ 32} As is stated above, appellant also contends that her trial counsel was ineffective in not objecting to the State's questioning in regard to appellant's character. Appellant notes that during cross-examination, the State questioned her about an *Page 10 
incident during which appellant was originally charged with domestic violence, but pleaded to a reduced charge of disorderly conduct, a misdemeanor. Appellant maintains that her counsel's failure to object to such questioning based on Evid. R. 608 and 609 prejudiced the jury.
 {¶ 33} Evid. R. 607 states that the credibility of a witness may be attacked by any party but that the "questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." See Evid. R. 607.
 {¶ 34} Evid. R. 608 states, in relevant part, as follows: "(B) Specific instances of conduct
 {¶ 35} "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609 may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."
 {¶ 36} In turn, Evid. R. 609 states, in relevant part, as follows: For the purpose of attacking the credibility of a witness: . . . (2) notwithstanding Evid. R. 403(A), but subject to Evid. R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines *Page 11 
that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 37} "(3) notwithstanding Evid. R. 403(A), but subject to Evid. R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance."
 {¶ 38} Appellant argues that the State improperly impeached her under Evid. R. 609 when it used her misdemeanor conviction for disorderly conduct to impeach her and that her trial counsel was ineffective in failing to object. However, we find that appellant put her own character at issue when she testified that she was the non-violent one of the family. Thus, such testimony was admissible, not to impeach appellant's credibility by showing that she was convicted of a misdemeanor, but to demonstrate that she was untruthful when she referred to herself as non-violent. See State v. Billings (1995), 103 Ohio App.3d 343,659 N.E.2d 799 and State v. Walker, Lawrence App. No. 01CA34, 2002-Ohio-7372. We find, therefore, that appellant was not prejudiced by her trial counsel's failure to object to the state's questioning. *Page 12 
 {¶ 39} Appellant's second assignment of error is, therefore, overruled.
 {¶ 40} Accordingly, the judgment of the Alliance Municipal Court is affirmed.
 Edwards, J. Farmer, P.J. and Delaney, J. concur *Page 13 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Alliance Municipal Court is affirmed. Costs assessed to appellant. *Page 1