STATE OF OHIO, Appellee,

v.

WEAVER, Appellant.

[Cite as *State v. Weaver*, 178 Ohio App.3d 504, 2008-Ohio-5022.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–07–1219.

Decided Sept. 30, 2008.

506

508

Julia R. Bates, Lucas County Prosecuting Attorney, and David F. Cooper, Assistant Prosecuting Attorney, for appellee.

Deborah Kovac Rump, for appellant.

---

PIETRYKOWSKI, Presiding Judge.

{¶ 1} This is an appeal of a June 11, 2007 judgment of the Lucas County Court of Common Pleas convicting appellant, Carrie Weaver, of the offense of endangering children and sentencing her to a term of imprisonment of three years. The offense is a violation of R.C. 2919.22(B)(1) and (E)(2)(d) and a second-degree felony. The trial court entered the judgment pursuant to a jury verdict after a five-day jury trial.

{¶ 2} The prosecution is based on the contention that appellant poisoned TM, her minor son, through repeatedly giving the boy syrup of ipecac and thereby causing serious, life-threatening injuries to the child. The claimed motive for the poisoning is the condition referred to as Munchausen syndrome by proxy or pediatric condition falsification.

{¶ 3} No witness testified at trial to observing appellant give her son ipecac syrup. To prove its case, the state relied substantially on circumstantial evidence, expert opinion testimony, and the fact that TM's condition improved after he was removed from the home and from further contact with appellant.

{¶ 4} Appellant also introduced expert opinion testimony at trial. Her expert contended that TM's conditions were caused by toxic mold infecting the townhouse where they lived and that exposure to the mold caused TM's deteriorating medical conditions. Appellant contended at trial that the removal of TM from the family townhouse was key to his recovery, not his removal from further contact with appellant.

{¶ 5} Appellant asserts six assignments of error on appeal:

{¶ 6} "Assignment of Error I: Weaver's conviction was against the manifest weight of the evidence.

{¶ 7} "Assignment of Error II: The trial court abused its discretion through various evidentiary rulings which precluded Weaver from receiving a fair trial.

{¶ 8} "Assignment of Error III: Weaver's right to confront witnesses against her and ultimately her right to Due Process were violated through the handling and introduction of the only physical quantitative evidence against her.

{¶ 9} "Assignment of Error IV: Weaver did not have effective assistance of counsel by his failure to lodge a key objection, and to offer evidence that directly repudiated the state's.

{¶ 10} "Assignment of Error V: The prosecutor engaged in prosecutorial misconduct by using a 22–year–old conviction that was not for a crime of moral turpitude, to impeach Weaver's expert witness. No prior notice was given. And, through improper closing arguments [sic].

{¶ 11} "Assignment of Error VI: Weaver's conviction is not supported by sufficient competent evidence."

{¶ 12} In December 2004, TM was nine years old and lived with appellant and his maternal grandmother, Kathy Weaver, in a townhouse located at 6517 Garden Road in Maumee, Ohio. The three had lived together at the Garden Road address since May 2000 and elsewhere before that.

{¶ 13} TM received medical care at Perrysburg Pediatrics since he was three. Two physicians associated with the practice group testified at trial—Dr. Tracy Karolyi and Dr. Carmen Weeber–Morse.

{¶ 14} Dr. Karolyi testified that in both 2001 and 2002, TM was treated for tachycardia, a rapid heartbeat. TM was seven in 2003 and very anxious. He had a tic disorder. An EEG was read as abnormal. He was seen by a pediatric neurologist, who diagnosed a seizure disorder. In 2004, TM had 11 or 12 visits with Perrysburg Pediatrics, and the group received at least as many phone calls from appellant as visits. In 2004, TM was under seizure medication that was being monitored by a pediatric neurologist. There were concerns that the boy was suffering from side effects from the seizure medication.

{¶ 15} Dr. Karolyi testified that TM had multiple bouts of vomiting and diarrhea in November and December 2004, followed by hospitalizations at Toledo Hospital. He was hospitalized for abdominal pain, vomiting, and diarrhea. His conditions included tachycardia, and he was followed by a cardiologist. A gastroenterologist was also consulted. Lab tests proved normal. He was hospitalized at Toledo Hospital on December 21 and 22, 2004, and December 29 through 31, 2004.

{¶ 16} Dr. William A. Suarez, a cardiologist, ordered medication for the rapid heart rate. TM was also on seizure medication, prescribed by a neurologist. Dr. Karolyi testified that TM received emergency-room treatment in February 2005, due to complaints of chest pain, shortness of breath, and heart palpitations. An

endocrinologist consulted. At the end of March, gastroenteritis symptoms of nausea and vomiting returned. TM was again hospitalized.

{¶ 17} Thereafter, Karolyi readmitted TM to the hospital on April 4, 2005. The weekend before, she saw TM at the office. He was "extremely symptomatic" and was "dry-heaving." Symptoms did not improve over the weekend. She admitted him for persistent vomiting and gastritis. Conditions included intermittent tachycardia as well as vomiting and diarrhea. Dr. Karolyi testified that she had reached no conclusion as to what was causing the symptoms when TM was readmitted to the hospital on April 4, 2005.

{¶ 18} The Perrysburg Pediatrics physicians shared responsibilities for conducting hospital rounds. Dr. Weeber–Morse handled hospital rounds during the week of April 4, 2005. TM's symptoms included vomiting, diarrhea, and tachycardia. Dr. Weeber–Morse testified that TM's condition deteriorated and that he developed cardiomyopathy, "which means dilation of the heart and poor function to the point where he was in intensive care unit and necessitated a transfer to the University of Michigan." Weeber–Morse testified that TM's condition was life-threatening at the time of the hospital transfer.

{¶ 19} Weeber–Morse further testified that there was a "constellation of symptoms." She concluded that the symptoms, lab test results, and "the way the child was behaving did not fit a typical pattern of metabolic disease or infectious disease process." She also was concerned that appellant had admitted to giving her son Tylenol and Motrin alternating every two hours, which she described as an "overdose situation." Dr. Weeber–Morse testified that she became suspicious and began to consider laxative abuse. The physician admittedly did not observe anyone giving TM ipecac.

{¶ 20} Robert C. Bobo, M.D., a gastroenterologist, performed GI studies of TM and took multiple biopsies.

{¶ 21} Dr. Karolyi conducted daily hospital visits with TM at Toledo Hospital during the week of April 19, 2005. At the time, she expressed a concern to the other physicians of her group that they had "multiple specialist involved," but nobody knew what was wrong.

{¶ 22} Dr. Karolyi also testified that during this hospitalization, appellant approached her and informed her that TM's half sibling (father's side) was ill and needed a kidney transplant and it had been questioned whether TM would be a suitable donor. Dr. Karolyi testified that she was shocked by the discussion. Karolyi also testified that she was concerned that appellant, a mother, was not upset and "raising the roof" because they had not diagnosed the cause of her son's illness.

{¶ 23} Dr. William A. Suarez testified that he is the chief of pediatric cardiology at the Medical College of Ohio. He treated TM for a rapid heart rate at Toledo Hospital in December 2004. He described TM's symptoms at the time as including nervous anxiety, fatigue, shortness of breath, chest pain, and palpitation of the heart rate. After various tests, he prescribed a medication—atenolol. TM responded well to treatment.

{¶ 24} Dr. Suarez followed TM as an outpatient in early 2005. TM's heart rate seemed under control. There were good test results from a 24–hour Holter monitor.

{¶ 25} After a short period, TM got sick again. Dr. Suarez was among the physicians who treated TM at Toledo Hospital after TM was admitted to the hospital on April, 4, 2005.[1] So were Suarez's partners and a pediatric rhythm specialist from the University of Michigan.

{¶ 26} Dr. Suarez testified that TM was quite ill during the hospitalization. TM had developed muscle fatigue. He had more nausea and vomiting. His heart rhythm had become persistently fast. Dr. Suarez saw changes in the heart muscle and concluded that it was weakening. He found a significant drop in heart function. According to Dr. Suarez, TM "was starting to develop signs of what we call dilated cardiomyopathy, and that is no less than a muscle of the heart that's normally functioning well, but at this point in time begins to fail. It begins to enlarge. The heart function is no longer normal. It's a fatigue of heart muscle and leads to congestive heart failure."

{¶ 27} Dr. Caren Goldberg is a cardiologist at the University of Michigan Hospital. TM was hospitalized there from May 13 through May 24, 2005. According to Dr. Goldberg, TM had cardiomyopathy of the heart muscle. The heart was not pumping well. TM had an abnormally fast heart rate. He had evidence of muscle breakdown—rhabdomyolysis. He also had nausea and vomiting and diarrhea.

{¶ 28} Physicians at the University of Michigan Hospital questioned whether TM was suffering from ipecac poisoning and ordered blood and urine tests for ipecac. Urine and blood samples were sent to the Mayo Clinic for testing. The Mayo Clinic in turn requested that the tests be performed by MEDTOX Laboratories of St. Paul, Minnesota.

{¶ 29} Karla Walker is the director of toxicology at MEDTOX. Her educational training includes a bachelor of science and doctorate in pharmacy as well as a

---

1. TM was hospitalized at Toledo Hospital from April 4 until May 13, 2005. He was transferred to the University of Michigan Hospital, where he was hospitalized from May 13 until May 24, 2005. He returned to Toledo Hospital and was hospitalized there from May 24 until June 3, 2005.

bachelor of science in medical technology. Walker testified to the procedures and practices of MEDTOX, including quality-control testing.

{¶ 30} Walker did not conduct the testing of the samples herself. She reviewed the MEDTOX records of the laboratory work. MEDTOX performed an analysis for two different compounds, emetine and cephaeline. These compounds were identified as alkoloids that are found in syrup of ipecac.

{¶ 31} Walker testified concerning the MEDTOX test results. Both emetine and cephaeline were found to be present in test samples that were collected on May 14, 2005. Additional samples, collected on May 29, 2005, were tested and reflected lower concentrations of both compounds.

{¶ 32} The test results were received at the University of Michigan Hospital on May 23, 2005. Upon receipt, antiarrhythmic medications (intended to treat abnormal heart rhythm) were stopped. TM's condition began to improve. A child-protection team headed by Dr. Elaine Pomeranz became involved.

{¶ 33} Dr. Pomeranz is a pediatrician with a subspecialty in pediatric emergency medicine. As head of the child-protection team at the University of Michigan, she helps treating physicians identify and direct the care of abused children and "direct the coordination with the investigative agencies." Pomeranz reviewed the medical records to determine whether she agreed with the conclusion of ipecac poisoning. She spoke to the primary-care physician, Dr. Karolyi. She concluded that there was enough suspicion of child abuse to notify child-protective services. Dr. Pomeranz recommended against permitting unsupervised contact by family members with TM.

{¶ 34} TM was placed in foster care and unsupervised family visits were prohibited. Doris Turner served as a foster parent to TM beginning in June 2005. She testified to a dramatic improvement in TM's condition over the period TM was in her care. A series of treating physicians testified that TM's conditions were caused by chronic ipecac poisoning and that symptoms from the poisoning resolved after further medical treatment was curtailed and family visits restricted.

{¶ 35} TM was 11 years old at the time of trial. He testified that when he lived with his mother he had seizures and threw up a lot. He testified that at home only his mother, not his grandmother, administered medications to him.

{¶ 36} Two physicians, Drs. Pomeranz and Ruhlen, testified to an opinion that TM was a victim of Munchausen syndrome by proxy. Three physicians—Drs. Karolyi, Weeber–Morse, and Pomeranz gave expert opinions that identified appellant as the person they concluded gave TM ipecac. This expert opinion testimony is detailed under Assignment of Error No. II.

{¶ 37} Appellant contended at trial that the evidence demonstrates that none of the treating physicians seriously suspected child abuse until after the MEDTOX results were received, and, according to the defense expert, Dr. William A. Croft, the MEDTOX results are flawed. Croft's educational background includes a bachelor of science in medical sciences, doctorate in veterinary medicine, and Ph. .n human pathology.

{¶ 38} Croft secured tissue samples from the muscle biopsies that were taken of TM at Toledo Hospital in 2005. He also secured some of TM's clothing from when he resided at the Garden Road townhouse. The home was inspected for toxic mold and samples taken for lab analysis.

{¶ 39} Croft testified that he has engaged in the study and research of molds since 1983. He testified that certain molds or fungi produce mycotoxin, a poisonous substance. He testified that trichothecene mycotoxin is the most poisonous mycotoxin created by molds or fungi. According to Dr. Croft, TM's biopsy tissue showed evidence of fibrinous inflammation, which is consistent with trichothecene mycotoxins, and that the toxin is very degenerative to muscles, causing them to become weaker and weaker. He testified that this is a chronic degenerative process that takes months or years to develop.

{¶ 40} Croft reviewed the 2005 Toledo Hospital muscle-biopsy tissue to determine whether there was evidence of mycotoxin in TM's tissue. This was done to determine whether trichothecene mycotoxins were involved in TM's health problems at that time. Croft testified to the existence of trichothecene mycotoxins in TM's muscle tissue, clothing, and samples taken from the basement of the Garden Road residence. Croft testified that these findings established that TM had been exposed to trichothecene mycotoxins while residing at the Garden Road residence.

{¶ 41} Craft testified that trichothecene mycotoxins would result in false positives for emetine and cephaeline—the two compounds identified in the MEDTOX studies. He testified that mycotoxin molecules mimic cephaeline and emetine.

{¶ 42} Croft also testified that emetine causes necrosis and damage to the mucosa membrane of the stomach. Dr. Croft testified as to his examination of a stomach muscle biopsy tissue. He testified, "There is nothing essentially wrong with this tissue. It's totally normal." Dr. Croft testified that trichothecene mycotoxin does not harm stomach tissue because of stomach acid.

{¶ 43} Appellant also claimed that chronic ipecac poisoning would be expected to result in weight loss and that TM had no history of weight loss.

{¶ 44} Appellant also presented evidence that she was not the sole caregiver for TM and that there were others who also visited him while he was hospitalized.

TM lived with appellant and Kathy Weaver, his maternal grandmother, for years before he was hospitalized. Kathy Weaver and appellant both prepared the meals in the home. They shared meal preparation on a 50–50 basis. Kathy Weaver also testified that TM's paternal grandmother would also periodically visit the boy. According to Kathy Weaver, TM was visited at Toledo Hospital by herself, Carol (his paternal grandmother), Brad (paternal grandfather), Adrienne Spangler, and Jenny Lewallen. TM's aunt, Emily Vandergrift, testified that she visited TM once a week when he was hospitalized.

{¶ 45} Kathy Weaver testified that TM participated in karate and Boy Scouts in 2004. He took swimming lessons. He played with the son of a woman who worked with appellant. He took a trip to Disneyland in April 2004, with Kathy Weaver and appellant.

{¶ 46} According to Kathy Weaver, TM had been in generally good health before they moved to the Garden Road townhouse, except for earaches and ear infections. Kathy Weaver also testified that TM was often in the basement at the Garden Road residence. He did school work in 2003 and 2004 in a little room in the basement that had been set up for that purpose. Kathy Weaver testified that TM would lie near air vents in the basement.

{¶ 47} The state called one rebuttal witness, Dr. Michael Eugene Ruhlen. Dr. Ruhlen is a pediatric physician and is board-certified in reviewing issues of appropriate care and whether patients should be hospitalized. He is the vice-president of medical affairs for Toledo Children's Hospital. Dr. Ruhlen testified that he has specialized in child-abuse and child-neglect evaluations. He testified to prior work and training at Children's Hospital in Washington, D.C. as part of its child-protection team.

{¶ 48} Dr. Ruhlen's testimony that this case presented an instance of Munchausen syndrome by proxy is addressed under Assignment of Error No. II. Dr. Ruhlen also testified that as a pediatrician he is knowledgeable as to molds. He testified that the defense claims concerning toxic mold in the case "are completely unsubstantiated." He testified to reports in literature of the effects of chronic exposure to ipecac causing a breakdown of muscle tissue, cardiomyopathy, development of congestive heart failure, and lethargy. Dr. Ruhlen denied that mycotoxins could mimic both emetine and cephaeline.

{¶ 49} In cross-examination, Dr. Ruhlen admitted that he has not authored publications in the area of ipecac or toxic mold exposure. He agreed that ipecac would cause stomach problems and leave some marker in the stomach. He admitted that muscle biopsies obtained at Toledo Hospital were not examined for mold. He admitted that he was not familiar with any of the literature on mycotoxins and mold.

{¶ 50} We consider appellant's Assignment of Error II first. Under the assigned error appellant asserts that he was denied a fair trial due to evidentiary rulings by the trial court. A trial court's ruling to admit or to exclude evidence will not be reversed on appeal absent an abuse of discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343; *State v. Smith*, 6th Dist. No. L–05–1350, 2007-Ohio-5592, 2007 WL 3044069, ¶ 43. " 'Abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. "An appellate court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice." *State v. Sage*, at 182, 510 N.E.2d 343.

### Exclusion of Expert Testimony Based upon Biopsy Slides from Appellant's Gall Bladder Surgery

{¶ 51} Appellant's expert, Dr. Croft, testified that samples taken in 2007 at the Garden Road townhouse, as well as of TM's clothing, established that TM had been exposed to trichothecane mycotoxin from toxic mold or fungi at the Garden Road residence. Dr. Croft also testified that a review of TM's biopsy tissue samples taken from 2005 biopsies for evidence of trichothecane mycotoxin exposure confirmed the presence of the mycotoxin in TM's tissue in 2005.

{¶ 52} Appellant underwent gall bladder surgery in 2004. She sought to introduce expert testimony at trial by Dr. Croft of his examination of tissue from her gall bladder to show it also contained mycotoxins. The evidence was offered in support of appellant's contention that TM's health issues were a result of exposure to toxic mold at the Garden Road residence. The trial court excluded any expert opinion testimony at trial based upon examination of the gall bladder tissue.

{¶ 53} The state objected to any testimony by the expert witness based upon his analysis of gall bladder tissue. Prior to trial, the state filed a motion to compel discovery concerning expert opinions and expert reports. At a hearing on the motion on April 6, 2007, the state argued that it needed the disclosure to permit it to secure a reciprocal expert and any necessary laboratory testing to respond to appellant's expert's opinions at trial. The trial court ordered appellant to supply the discovery by April 13, 2007.

{¶ 54} Nevertheless, appellant did not disclose the expert's anticipated testimony concerning the gall bladder tissue until May 1, 2007, the second day of trial. The disclosure was oral only. On May 4, 2007 (day five, the final day of trial), the state first received gall bladder tissue slides for analysis. The state contended

that the late disclosure prejudiced it because it was unable to secure an expert witness to respond to the appellant's claims based upon analysis of the gall bladder tissue and had been unable to secure a laboratory analysis of the tissue itself.

{¶ 55} In excluding the evidence, the trial court concluded that the appellant had failed to meet her obligation to disclose test results and information concerning the intended testimony of appellant's expert to the state within a "reasonable period of time to allow them to fairly and fully prosecute the case or rebut part" of appellant's.

{¶ 56} Crim.R. 16(E)(3) affords a trial court with authority to set discovery deadlines. See *State v. Brooks*, 7th Dist. No. 04JE10, 2004-Ohio-4546, 2004 WL 1926002, ¶ 26. "The purpose of discovery rules is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial." *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 3, 511 N.E.2d 1138.

{¶ 57} In *Lakewood v. Papadelis,* the Ohio Supreme Court announced a balancing test for determining the proper sanction for violation of discovery rules:

{¶ 58} "[A] trial court must inquire into the circumstances surrounding a violation of Crim.R. 16 prior to imposing sanctions pursuant to Crim.R. 16(E)(3). Factors to be considered by the trial court include the extent to which the prosecution will be surprised or prejudiced by the witness' testimony, the impact of witness preclusion on the evidence at trial and the outcome of the case, whether [the] violation of the discovery rules was willful or in bad faith, and the effectiveness of less severe sanctions." Id. at 5, 511 N.E.2d 1138.

{¶ 59} Under *Lakewood v. Papadelis,* the sanction imposed for a violation of a discovery rule must be "the least severe sanction that is consistent with the purpose of the rules of discovery." Id. at paragraph two of syllabus.

{¶ 60} The record sets forth a series of attempts by the trial court, both before and during trial, to secure disclosure by appellant of intended expert testimony and particularly the intent to use any additional lab studies at trial. Appellant did not disclose the intent to pursue expert testimony based upon the laboratory analysis of gall bladder tissue until the second day of trial and the state lacked tissue slides to conduct its own expert analysis until day five.

{¶ 61} The proposed testimony would have clearly aided in the defense to provide additional evidence of environmental exposure of both appellant and TM to mycotoxins. We agree, however, with the trial court that the state was unreasonably prejudiced in its ability to secure an expert to evaluate and respond to the proposed expert testimony.

{¶ 62} In our view, the trial court did not abuse its discretion in excluding testimony concerning Dr. Croft's analysis of gall bladder tissue under the circumstances. Under the circumstances, the sanction of excluding the expert testimony was the least severe sanction available consistent with the purpose of the discovery rules "to prevent surprise and the secreting of evidence favorable to one party" and "to produce a fair trial." *Lakewood v. Papadelis*, 32 Ohio St.3d at 3, 511 N.E.2d 1138.

### Pure Earth Laboratory Reports and Request for Telephone Deposition of Pure Earth Representative During Trial

{¶ 63} Appellant contends that the trial court erred because it "refused to allow anyone from Pure Earth Laboratory to testify" by deposition concerning its lab results. James Johnson of Seagate Consulting Services inspected the Garden Road residence for mold. Johnson took samples for laboratory analysis and sent half to Dr. William Croft and half to Pure Earth Laboratory for analysis. The lab reports were marked defendant's exhibit B and consist of Pure Earth Laboratory reports on testing for fungi of samples identified as taken from six different locations in the basement at 6517 Garden Road. Appellant argues on appeal that use of the Pure Earth test results would have acted to corroborate the testimony of Dr. Croft concerning evidence of the existence mycotoxins at the residence.

{¶ 64} On day three of trial, the trial court overruled a request to admit the report of Pure Labs into evidence on the basis of hearsay, based upon the fact that appellant was not intending to present any witness to authenticate the report or to testify as to it. The following morning, appellant requested leave to take a deposition by telephone of a Pure Labs representative to authenticate the report.

{¶ 65} The state opposed the request. The trial court overruled the request based upon the failure of the defendant to make the required showing under Crim.R. 15(A) for proceeding with the deposition. It held that reasonable notice was lacking and that there was an absence of evidence that the witness was unable to attend trial.

{¶ 66} Crim.R. 15(A) provides for depositions of prospective witnesses. The rule provides for depositions of prospective witnesses if they "will be unable to attend or will be prevented from attending a trial or hearing." Crim.R. 15(A). Appellant sought leave under the rule to take the deposition of a Pure Labs representative to testify concerning authentication of lab test results. The lab had been retained months before to test samples for mold or fungi. At the hearing on the motion, appellant did not contend that lab representatives were unavailable or were prevented from attending trial to testify. Appellant presented no evidence to support a finding of witness unavailability. The record does

include the fact that counsel had not attempted to secure attendance at trial of a Pure Labs representative until the Saturday before trial.

{¶ 67} As Crim.R. 15(A) requires a showing that the prospective witness is unavailable or prevented from attending trial, the trial court did not abuse its discretion denying the request for deposition of a Pure Lab representative for use at trial.

### Admissibility of Opinion Testimony that Appellant Poisoned TM and that TM Was a Victim of Munchausen Syndrome by Proxy

{¶ 68} Appellant also argues under Assignment of Error No. II that "[t]he trial court erred by allowing, over objection, several witnesses to testify as experts that Weaver had Munchausen's Syndrome by Proxy and that Weaver poisoned her son with syrup of ipecac."

{¶ 69} We deal first with the admissibility of expert opinion testimony that TM was a victim of Munchausen syndrome by proxy. Two expert witnesses testified on the issue—Dr. Pomeranz and Dr. Ruhlen. Both claimed specialized knowledge of Munchausen syndrome by proxy and both were accepted by the trial court as expert witnesses on child abuse. They are both pediatricians.

{¶ 70} Dr. Pomeranz is a pediatrician at the University of Michigan and head of its child-protection team. In that role she helps treating physicians identify and direct care of abused children. She testified that through her work at the University of Michigan, with referrals from throughout the region, she is knowledgeable as to the condition of Munchausen syndrome by proxy that is now referred to as pediatric conditions falsification.

{¶ 71} Dr. Ruhlen is the vice-president of medical affairs for Toledo Children's Hospital. He testified that he is a pediatrician and has specialized in child-abuse and neglect evaluations at the hospital. Prior to coming to Toledo, Dr. Ruhlen worked and trained as part of the child-protection team at Children's Hospital in Washington, D.C.

{¶ 72} In *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the Ohio Supreme Court considered alleged sexual abuse of a two-year-old child and use of expert witness testimony under Evid.R. 702 in such a case. Considering Evid.R. 702, the court permitted use of opinion testimony by persons holding "other specialized knowledge" to assist the fact-finder to understand evidence in a case.

{¶ 73} "The phrase 'other specialized knowledge' is found in the rule [Evid.R. 702] and, accordingly, if a person has information which has been acquired by experience, training or education which would assist the trier of fact in understanding evidence of a fact in issue and the information is beyond common experience, such person may testify." *Boston* at 118, 545 N.E.2d 1220.

{¶ 74} The court concluded that sexual child abuse presented an issue for which "specialized knowledge" concerning sexual child abuse would aid a jury because "[m]ost jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse. Incest is prohibited in all or almost all cultures and the common experience of a jury may represent a less-than-adequate foundation for assessing whether a child has been sexually abused." *Boston*, 46 Ohio St.3d at 128, 545 N.E.2d 1220.

{¶ 75} The *Boston* court recognized that "specialized knowledge" concerning child abuse may be held by "a priest, a social worker or a teacher, any of whom might have specialized knowledge * * * and training in recognizing occurrences of child abuse." Id. at 119, 545 N.E.2d 1220.

{¶ 76} In *Boston*, the Ohio Supreme Court " 'determined that expert testimony on the ultimate issue of whether sexual abuse has occurred in a particular case is helpful to jurors and is therefore admissible pursuant to Evid.R. 702 and 704.' *State v. Gersin* (1996), 76 Ohio St.3d 491, 494, 668 N.E.2d 486, 488, citing *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220." *State v. Stowers* (1998), 81 Ohio St.3d 260, 261, 690 N.E.2d 881.

{¶ 77} Subsequently, in *State v. Nemeth* (1998), 82 Ohio St.3d 202, 215, 694 N.E.2d 1332, the Ohio Supreme Court also permitted "specialized knowledge" opinion testimony in battered child-syndrome cases on the issue of the effects of child abuse in testimony offered by the criminal defendant.

{¶ 78} Decisions from other jurisdictions considering Munchausen syndrome by proxy have recognized that expert testimony concerning the condition is admissible to assist a jury in understanding motive—why an "otherwise seemingly caring and devoted mother would intentionally inject her son with unnecessary insulin" or otherwise cause or fabricate a child's illness. *Austin v. State* (Tex.App.2007), 222 S.W.3d 801, 807–808; see *Masters v. People* (Colo.2002), 58 P.3d 979, 991–992; *People v. Phillips* (1981), 122 Cal.App.3d 69, 84–85, 175 Cal.Rptr. 703. That approach appears consistent with the Ohio Supreme Court's decision in *Boston*.

■ {¶ 79} Applying *Boston* in the context of Munchausen syndrome by proxy, testimony by persons holding specialized knowledge concerning the condition, of an opinion that the child has been a victim of such child abuse, would be relevant and admissible. Dr. Ruhlen's testimony was limited to the opinion that TM was a victim of Munchausen syndrome by proxy. We find that that testimony was admissible as an aid to the jury under *Boston*.

{¶ 80} Dr. Pomeranz testified to an opinion that TM's condition was consistent with "pediatric condition falsification by ipecac poisoning by his mother." To the extent the testimony was limited to an opinion that the evidence was consistent

with TM's being a victim of pediatric condition falsification (a.k.a. Munchausen syndrome by proxy) the testimony is authorized by *Boston*.

{¶ 81} *Boston* does not stand for unlimited use of expert opinion testimony. In *Boston*, expert opinion testimony on whether the child victim's statements concerning abuse were truthful was prohibited. *Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220, at syllabus, *Stowers*, 81 Ohio St.3d at 262, 690 N.E.2d 881. Such testimony was held to infringe on the role of the fact-finder and "was not only improper—it was egregious, prejudicial and constitutes reversible error." *Boston* at 128–129, 545 N.E.2d 1220.

{¶ 82} The testimony here, however, went beyond testimony concerning the nature of Munchausen syndrome by proxy and opinion testimony as to whether TM was a victim of that abuse. Dr. Tracy Karolyi, Dr. Carmen Weeber–Morse, and Dr. Elaine Pomeranz each testified to an opinion that appellant caused TM's medical condition or, more directly, to an opinion that appellant poisoned TM.

{¶ 83} In addition to her opinion of "ipecac poisoning by his mother," Dr. Pomeranz responded to a question asking whom she "suspected of giving this ipecac" to TM and testified to an opinion that appellant was the person who gave the boy ipecac:

{¶ 84} "Q. Based upon your review of the medical records, conversations with other doctors, *do you have an opinion as to who you suspected of giving this ipecac* to * * *[TM]* * *?

{¶ 85} "Mr. Zaner: Objection.

{¶ 86} "The Court: Overruled.

{¶ 87} "A. Yes, I do.

{¶ 88} "Q. (By Mr. Miller) And who is that?

{¶ 89} "A. *His mother.*" (Emphasis added.)

{¶ 90} Neither Dr. Karolyi nor Dr. Weeber–Morse testified to experience dealing with Munchausen syndrome by proxy. Neither was offered as an expert in child abuse. Neither testified to an expert opinion that TM was a victim of Munchausen syndrome by proxy.

{¶ 91} Nevertheless, Dr. Karolyi testified to an expert opinion of who caused TM's adverse medical conditions:

{¶ 92} "Q. (By Mr. Miller) Based upon the records you reviewed, the doctors you talked to, going back through your charts, your training, your education, your experience, being mandatory reporter of abuse, do you have an opinion within a

reasonable degree of medical probability as to who caused * * * [TM's] conditions?

{¶ 93} "A. Yes

{¶ 94} "Q. And what is your opinion?

{¶ 95} "Mr. Zaner: Objection.

{¶ 96} "The Court: Overruled.

{¶ 97} "Q. (By Mr. Miller) Go ahead.

{¶ 98} "A. *His mother, Carrie Weaver.*" (Emphasis added.)

{¶ 99} Dr. Weeber–Morse testified to an expert opinion that appellant poisoned the child:

{¶ 100} "Q. Do you have an opinion within a reasonable degree of medical certainty based on your training, education, experience, your treatment of * * *[TM] as to whether—as to who would have been giving the ipecac to * * *[TM]?

{¶ 101} "A. From my understanding from what I know through my medical records of—

{¶ 102} "Mr. Zaner: Objection.

{¶ 103} "The Court: Basis?

{¶ 104} "Mr. Zaner: The first question is a yes or no.

{¶ 105} "The Court: That's true. The question is do you have an opinion?

{¶ 106} "A. Yes, I have an opinion.

{¶ 107} "Q. (By Mr. Miller) What is your opinion?

{¶ 108} "Mr. Zaner: Objection

{¶ 109} "The Court: Overruled.

{¶ 110} "Mr. Miller: Go ahead.

{¶ 111} "A. Can I go?

{¶ 112} "Q. Yes.

{¶ 113} "A. Can you repeat the question?

{¶ 114} "Q. *What is your opinion as to whether the mother—as to who is involved?*

{¶ 115} "A. I remember the question.

{¶ 116} "Q. Good. Because I didn't.

{¶ 117} "A. The review of* * *[TM's] medical home chart from my office, it is—the information that was provided by Carrie Weaver says she was home schooling this child and that the child lived with herself, and the reason why I wrote all household contact is because as far as I was aware, she was the only adult caring for this child and she was a single parent caring for this child. Therefore, any other household members would not necessarily be family members. That was the other reason I wrote household members, and since the only exposure that this child had was his mother, Carrie Weaver, and she nearly sequestered him for years with home schooling him and keeping him at home and bringing him just to physician's offices, *my opinion is that Carrie Weaver was the one poisoning her son with ipecac.*" (Emphasis added.)

{¶ 118} It has been recognized that there are "permissible boundaries" under *Boston* as to opinion testimony in a criminal case. *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, ¶ 57. In *State v. Bell*, the Second District Court of Appeals considered opinion testimony in a child-sexual-abuse case. The court recognized that opinion testimony as to whether the defendant in fact committed the offense is prohibited:

{¶ 119} "Dr. Miceli simply offered her opinions regarding the wide range of behavioral characteristics displayed by minor victims of sexual abuse. The law clearly permits this kind of expert testimony, and *Dr. Miceli did not go beyond permissible boundaries and opine whether these children were in fact abused by Bell.*" (Emphasis added.) Id. at ¶ 57.

{¶ 120} In *Burens v. Indus. Comm.* (1955), 162 Ohio St. 549, 55 O.O. 436, 124 N.E.2d 724, the Ohio Supreme Court recognized limitations on the use of expert testimony where the jury is capable of evaluating evidence:

{¶ 121} "An expert witness must confine his opinion to matters within his specialty or scientific field of inquiry and may not express an opinion upon matters as to which the jury is capable of forming a competent conclusion." Id. at paragraph two of the syllabus. This limitation on the use of expert opinion testimony has been incorporated into the Ohio Rules of Evidence. *State v. Campbell* (Mar. 15, 2002), 1st Dist. Nos. C–010567 and C–010596, 2002 WL 398029; *Rasalan v. TJX Operating Cos., Inc.* (1998), 129 Ohio App.3d 364, 369, 717 N.E.2d 1123. Evid.R. 702 limits the use of expert opinion testimony to circumstances where "the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay person." Evid.R. 702(A).

{¶ 122} Under *Boston,* due to their "specialized knowledge" of Munchausen syndrome by proxy, the physician opinions as to whether the facts in this case are

consistent with Munchausen syndrome by proxy were relevant, would have assisted a jury in understanding the evidence and, therefore, were admissible.

{¶ 123} Drs. Karolyi, Weeber–Morse, and Pomeranz, however, testified to opinions beyond whether Munchausen syndrome by proxy was involved in this case. They each testified to an opinion that appellant either caused TM's condition or poisoned TM by giving him ipecac.

{¶ 124} Dr. Karolyi explained her expert analysis in reaching the conclusion that appellant caused TM's conditions:

{¶ 125} "Q. And what do you base that opinion on?

{¶ 126} "A. Not only the lab findings and his symptoms and signs, but the fact that when he was removed from her care we saw a vast transformation in * * *[TM] as far as his medical conditions."

{¶ 127} Drs. Weeber–Morse and Pomeranz described similar reasoning behind their opinions that appellant poisoned TM.

{¶ 128} In our view a jury is capable of undertaking such an analysis and making a determination of who, if anyone, gave TM ipecac on its own without the aid of expert testimony. Appellant was not the only caregiver in the home. She also was not the only caregiver or family member who visited the child in the hospital. With knowledge of the condition of Munchausen syndrome by proxy, the jury was capable of determining whether any caregiver harmed TM. Accordingly, we conclude that under *Burens v. Indus. Comm.* as well as Evid.R. 702 and 704, it was an invasion of the jury province for Drs. Karolyi, Weeber–Morse, and Pomeranz to testify to expert opinions that appellant caused the injuries to her son or poisoned him. Accordingly, we conclude that the trial court abused its discretion in permitting that opinion testimony at trial.

{¶ 129} Crim.R. 52(A) defines harmless error. It provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." *State v. Bayless* (1976), 48 Ohio St.2d 73, 2 O.O.3d 249, 357 N.E.2d 1035, paragraph seven of the syllabus. In considering the issue of harmless error, appellate courts are to "assess the impact" of the inadmissible testimony on the jury. *State v. Rahman* (1986), 23 Ohio St.3d 146, 151, 23 OBR 315, 492 N.E.2d 401, fn. 4.

{¶ 130} This case does not involve overwhelming evidence of guilt. There was conflicting expert evidence on the cause of TM's medical condition. The evidence that appellant gave TM ipecac was circumstantial. In our view, the impact of the inadmissible expert testimony on the jury was highly prejudicial

and weakened appellant's contention that there was a cause of TM's medical condition other than ipecac poisoning.

{¶ 131} We cannot find that the error was harmless beyond a reasonable doubt or that the evidence did not contribute to appellant's conviction in any meaningful way. Accordingly, we conclude that the error was not harmless.

{¶ 132} Under the circumstances, we conclude that the expert testimony by Drs. Karolyi, Weeber–Morse, and Pomeranz identifying appellant as the person who caused injury to TM or poisoned him with ipecac prevented appellant from having a fair trial and constitutes reversible error. We find that appellant's Assignment of Error No. II is well taken with respect to that testimony.

### Claimed Violation of Evid.R. 609(B) Restrictions on Impeachment

{¶ 133} Under Assignment of Error No. V, appellant claims two instances of prosecutorial misconduct. First, appellant asserts that the state's use, without prior notice, of a 22–year–old felony conviction to impeach appellant's expert witness violated Evid.R. 609(B) and was plain error. Evid.R. 609(B) does restrict use of prior convictions for impeachment of a witness if more than ten years has elapsed (since the date of conviction, release from confinement, termination of probation, shock probation, parole, or shock parole) unless there has been prior written notice as set forth in the rule. *State v. Carpenter*, 6th Dist. No. E–00–033, 2002-Ohio-2266, 2002 WL 1003520, ¶ 57.

{¶ 134} The general provisions of Evid.R. 609 declare that it applies to use of evidence of a prior conviction "[f]or the purpose of attacking the credibility of a witness." Evid.R. 609(A). A series of decisions has recognized that restrictions on the use of stale felony convictions for impeachment under Evid.R. 609(B) do not apply when the evidence is offered not to attack the witness's credibility but to dispute facts in evidence. E.g., *Alliance v. Cagey*, 5th Dist. No. 2007CA00273, 2008-Ohio-3653, 2008 WL 2840606, ¶ 38; *State v. Jones*, 8th Dist. No. 84338, 2004-Ohio-6286, 2004 WL 2676741, ¶ 22; *State v. Billings* (1995), 103 Ohio App.3d 343, 346, 659 N.E.2d 799.

{¶ 135} On direct examination, Dr. Croft testified concerning his experience and work history and information on his curriculum vitae. The CV listed consulting work with Midwest Stat Path of Madison, Wisconsin from 1983 to 1996. Referring to that period, the CV stated, "I have had no restrictions of investigation, and have been limited only by my own intelligence."

{¶ 136} On cross-examination Dr. Croft testified that the work for Midwest Stat Path was "pretty much" full-time employment and "pretty much" consistent from 1983 to 1996. He reaffirmed in cross-examination the lack of restrictions on his work during the period. Thereafter, the state questioned the witness on the

fact that he had been convicted of conversion of public money in 1985 and was confined in federal prison for over eight months in 1985.

{¶ 137} In our view, appellant opened the door for testimony concerning whether there were any restrictions on Dr. Croft's consulting work in the year 1985 through his testimony on direct concerning his prior work experience and through use of his CV. Testimony as to his conviction and imprisonment was admissible to provide evidence that the witness had exaggerated his prior work experience and not to attack credibility on the basis of a prior criminal conviction. Accordingly, the restrictions on use of the felony conviction under Evid.R. 609(B) did not apply.

{¶ 138} Appellant also asserts prosecutorial misconduct in closing argument. First, appellant claims that the prosecutor commented on the failure of appellant to testify. Second, the appellant contends that the prosecutor improperly took advantage of the trial court's refusal to permit expert testimony concerning appellant's gall bladder tissue by commenting to the jury of the absence of evidence of illnesses to members of the household other than TM.

{¶ 139} The prosecutor's stated:

{¶ 140} "And lastly, ladies and gentlemen, as far as her demeanor goes, defendant says she's so scared and so nervous. Her son took the stand on Monday, and I know it's been a while ago now. But think about him taking that stand. She had not seen or heard from him in two years. Not one shred of emotion from her, nothing.

{¶ 141} "Dr. Caren Goldberg spent just a very little time with her son, and when she read that letter of the things that happened to [TM], she got choked up. But not Carrie."

{¶ 142} Appellant failed to object to the statement at the time it was made, and therefore the issue is subject to review on appeal under the plain-error standard.

{¶ 143} Such comments have been interpreted as referring to a defendant's appearance or demeanor and not to the defendant's failure to testify. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 347, 595 N.E.2d 902 (failure to react to tearful testimony of mother); *State v. Hill* (1996), 75 Ohio St.3d 195, 203, 661 N.E.2d 1068 (failure to react to scenes depicting defendant's dead child). Even if the comment was otherwise improper, under the circumstances, in our view, it did not act to deprive appellant of a fair trial.

{¶ 144} Appellant asserts that the prosecutor improperly commented in closing argument that neither appellant nor her mother became sick from mold. Upon review of the record, we conclude that the comment represents a fair comment on

the evidence at trial. Accordingly, we find that Assignment of Error No. V is not well taken.

### Claimed Denial of Right to Confront Witnesses in Admitting MEDTOX Lab Reports into Evidence

{¶ 145} In Assignment of Error No. III, appellant argues that her right to confront witnesses under both the United States and Ohio Constitutions was violated by the trial court's admission into evidence of the MEDTOX laboratory reports. MEDTOX Laboratories of St. Paul, Minnesota, tested blood and urines samples while TM was hospitalized.

{¶ 146} The MEDTOX reports identified the existence of ipecac markers of emetine and cephaeline in testing of two different blood samples and one urine sample taken from TM. The samples were taken on May 14, 2005, and May 29, 2005. Appellant claims that the trial court violated her right to confront witnesses as recognized in the United States Supreme Court decision *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, by admitting the reports into evidence without her having the opportunity to cross-examine the person who conducted the testing and prepared the reports.

{¶ 147} Karla Walker testified at trial. Walker is the director of toxicology at MEDTOX Laboratories in St. Paul, Minnesota. Walker has a bachelor of science degree in medical technology as well as a bachelor of science degree and a doctorate in pharmacy. She also had a two-year postdoctoral fellowship in infectious diseases and pharmakinetics. Walker was accepted, without objection, as an expert witness in pharmacology and toxicology at trial.

{¶ 148} Walker testified that she was familiar with the testing performed by MEDTOX as to TM's samples. She reviewed the records and pulled the laboratory work related to the testing done and did a full review of all the work. Walker testified as to testing procedures including the running of quality-control samples to ensure accuracy of test results. Records were available at trial not only of test results of TM's samples but also test results of the quality-control samples.

{¶ 149} Walker testified that the testing performed was through use of a liquid chromatography with tandem mass spectroscopy and explained the process and equipment. Walker testified to the test results, including concentrations of emetine and cephaeline found in each sample. Walker also testified that MED-TOX Laboratory is certified and that standards required for certification were met.

{¶ 150} In *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, the Ohio Supreme Court considered the limitations imposed by a defendant's

right to confront witnesses upon use of out-of-court statements by witnesses who do not testify at trial under the decision of the United States Supreme Court of *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crager,* as this case, involved use of a laboratory test result with the person who conducted the testing and prepared the report not testifying at trial. The Ohio Supreme Court held in *Crager*:

{¶ 151} "1. Records of scientific tests are not 'testimonial' under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 152} "2. A criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing." *State v. Crager,* paragraphs one and two of the syllabus.

{¶ 153} In our view, the issues presented under appellant's Assignment of Error No. III are controlled by the Ohio Supreme Court's decision in *State v. Crager.* The MEDTOX laboratory reports are not testimonial for purposes of the right to confront witnesses under *Crawford v. Washington* and the appellant's right to confrontation was not violated through the state's using Karla Walker, a qualified laboratory analyst, to testify concerning the MEDTOX reports.

{¶ 154} Appellant argues that *Crager* is distinguishable due to the fact that the laboratory involved in *Crager* was a governmental laboratory, the Ohio Bureau of Criminal Identification and Investigation ("BCI"), and, here, MEDTOX is a private laboratory.

{¶ 155} The fact that the report was prepared by a private laboratory strengthens the nontestimonial argument, not weakens it. The *Crager* court considered an argument that the BCI's statutory mission, to aid law enforcement, required BCI reports to be treated as testimonial despite authority that such reports by private laboratories are to be treated as nontestimonial. *State v. Crager,* 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, at ¶ 51–52. The Ohio Supreme Court specifically rejected the argument that state and private laboratories should be treated differently on the issue of whether their lab reports are considered nontestimonial. Id. In our view, the MEDTOX reports were nontestimonial under *Crager,* and the trial court did not abuse its discretion in admitting them into evidence.

{¶ 156} Finally, appellant argues that a proper foundation was not laid for admission of the reports at trial due to a lack of evidence establishing the chain of custody of test samples. No chain-of-custody argument was raised in the trial court. The issue is deemed waived absent plain error. *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 187.

{¶ 157} Evidence concerning the taking of the samples is contained in the hospital records from the Toledo Hospital and University of Michigan that were admitted into evidence at trial. The tests reports for testing for ipecac markers of samples collected on May 14, 2005, and May 29, 2005, were contained in the Mayo Clinic medical records. The reports state that they were performed by MEDTOX Laboratories.

{¶ 158} Dr. Karla Walker, of MEDTOX, testified at trial that the reports prepared by MEDTOX as contained in the Mayo Clinic medical records were identical to copies of the reports maintained by MEDTOX in its own records. She also testified that MEDTOX performed the tests specified in the reports of TM's samples that are identified in the reports. No contrary evidence was presented at trial.

{¶ 159} The Ohio Supreme Court has cautioned that plain error is noticed "only in exceptional circumstances" and "to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 94–97, 7 O.O.3d 178, 372 N.E.2d 804. Such circumstances are lacking here. See *State v. Leroux* (July 29, 1994), 6th Dist. No. H–93–56, 1994 WL 395135. We conclude that there was no plain error in admitting MEDTOX test reports on ipecac markers based upon the chain of custody of TM's urine and blood test samples. Assignment of Error No. III is not well taken.

### Claimed Ineffective Assistance of Counsel

{¶ 160} Under Assignment of Error No. IV, appellant contends that his trial attorney provided ineffective assistance of counsel in three respects: first, due to trial counsel's failure to object to cross-examination of Dr. Croft as to his prior felony record; second, due to trial counsel's failure to present evidence that the appellant did not suffer from Munchausen syndrome by proxy; and, third, due to the failure of trial counsel to call Dr. Gregory Forgac to testify at trial.

{¶ 161} To establish ineffective assistance of counsel, a criminal defendant must prove two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Prejudice under *Strickland v. Washington* requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052.

{¶ 162} In view of our determination that the cross-examination of Dr. Croft concerning his prior felony conviction did not violate Evid.R. 609(B), counsel was not deficient in failing to object to the cross-examination.

{¶ 163} There is no evidence in the record as to the availability of favorable expert opinion testimony to appellant on whether she suffered from Munchausen syndrome by proxy. There is also no evidence in the record as to the nature of any expert opinions held by Dr. Gregory Forgac that appellant now claims should have been offered at trial.

{¶ 164} Where a claim of ineffective assistance of counsel requires consideration of materials outside the record of proceedings in the trial court, the claim is not of the type that can be considered on direct appeal. *State v. Carter* (2000), 89 Ohio St.3d 593, 606, 734 N.E.2d 345; *State v. Davis*, 6th Dist. No. L–05–1056, 2006-Ohio-2350, 2006 WL 1305101, ¶ 21. Accordingly, we conclude that appellant's Assignment of Error No. IV is not well taken.

### Sufficiency of the Evidence

{¶ 165} Under Assignment of Error No. VI, appellant contends that there was insufficient evidence to support a conviction. We disagree.

{¶ 166} Appellant was convicted of the offense of child endangerment, a violation of R.C. 2919.22(B)(1) and (E)(2)(d). R.C. 2919.22(B)(1) provides:

{¶ 167} "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

{¶ 168} "(1) Abuse the child."

{¶ 169} Under R.C. 2919.22(E)(2)(d) a violation of R.C. 2919.22(B)(1) is a felony of the second degree if the violation "results in serious physical harm to the child involved."

{¶ 170} "Sufficiency" concerns a question of law on whether the evidence at trial is legally adequate to support a jury verdict as to all elements of a crime. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, identified the required analysis to determine whether there was sufficient evidence to support a conviction:

{¶ 171} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"

{¶ 172} After a review of the record and weighing the evidence in favor of the prosecution, we conclude that a reasonable trier of fact could have concluded beyond a reasonable doubt that appellant abused TM while he was under the age of 18 and that abuse resulted in serious physical harm to TM. We find that Assignment of Error No. VI is not well taken.

### Manifest Weight of the Evidence

{¶ 173} Under Assignment of Error No. I, appellant argues that her conviction was against the manifest weight of the evidence. This assignment of error is rendered moot by our ruling on Assignment of Error No. II, and we decline to consider Assignment of Error No. I. App.R. 12(A)(1)(c).

{¶ 174} On consideration whereof, this court finds that appellant was prejudiced and prevented from having a fair trial. The judgment of the Lucas County Court of Common Pleas is reversed, and this case is remanded to the Lucas County Court of Common Pleas for further proceedings consistent with this decision.

{¶ 175} Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal are awarded to Lucas County.

Judgment reversed.

SKOW and OSOWIK, JJ., concur.