[Cite as *State v. Thoss*, 2018-Ohio-4051.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                    Court of Appeals No. S-16-043

       Appellee                            Trial Court No. 15 CR 57

v.

Chantal N. Thoss                        **DECISION AND JUDGMENT**

       Appellant                            Decided:  October 5, 2018

* * * * *

Timothy Braun, Sandusky County Prosecuting Attorney, and
Mark E. Mulligan, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Patrick T. Clark,
Assistant State Public Defender, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Chantal Thoss, appeals the judgment of the Sandusky County Court of Common Pleas, following a jury trial, convicting her of one count of felonious assault.  For the reasons that follow, we reverse.

## I. Facts and Procedural Background

{¶ 2} On January 20, 2015, the Sandusky County Grand Jury indicted appellant on one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree, and one count of endangering children in violation of R.C. 2919.22(A) and (E)(2), a felony of the third degree. Appellant entered pleas of not guilty, and the matter proceeded to a jury trial.

{¶ 3} At the trial, Officer Dana Widman of the Clyde Police Department testified that on the evening of December 10, 2014, she received a call to respond to a baby that fell off of a couch. Widman was the first to arrive at the scene, where she encountered appellant, the babysitter, whom she described as distraught and very emotional. Appellant led Widman to the six-month-old baby, E.A., who was lying on the couch. Widman testified that E.A. was breathing but was not moving. His muscles were very tense, and his eyes were rolled back into his head. E.A. did not respond when Widman touched his stomach or his feet, but he did grab her hand when she touched his.

{¶ 4} At that point, emergency medical personnel arrived and took over the care of E.A. Widman removed appellant to the kitchen, where appellant explained that she had placed E.A. on the couch and left to go get a diaper. While she was away, appellant heard E.A. crying loudly, and when she returned to check on him, found him lying on his back with his leg up in the air against the couch. Appellant told Widman that when she picked E.A. up, his head snapped back, and that is when he became motionless and silent.

2.

{¶ 5} E.A.'s mother, A.A., testified next for the state. She explained that E.A. was born in June 2014, in his amniotic sac, but other than that she had an unremarkable delivery. A.A. took E.A. to the doctor for his one-month well-check, on July 1, 2014, and there were no issues. E.A. went to the doctor again around the end of July 2014 because it appeared that he was choking. The doctor prescribed some gas drops, and that appeared to resolve the problem. A.A. did not take E.A. back to the doctor for any other well-checks, despite being instructed to do so.

{¶ 6} A.A. stated that at the time of the incident, when E.A. was approximately six months old, E.A. would not lay on his stomach. Instead he would lay on his back and play with toys. A.A. explained that E.A. did not roll over, or raise up on his hands and knees, or move in any way. A.A. also testified that until December 10, 2014, she had not noticed anything unusual about E.A.'s condition that would lead her to believe that he had any illness or injury. However, A.A. acknowledged that E.A. was not able to babble at six months, and that he was delayed in that regard.

{¶ 7} A.A. testified that when she went back to work in the middle of July 2014, her cousin's sister babysat E.A. When A.A. started to work the midnight shift beginning around August, A.A.'s mother watched E.A. some, and a neighbor living below A.A. watched him some. In September 2014, A.A. moved to Sandusky, and took E.A. to be watched at her fiancé's sister's home. A.A. eventually discontinued the arrangement with her fiancé's sister because she was concerned with the cleanliness of the home.

3.

A.A.'s fiancé also watched E.A. a few times during this period. A.A.'s fiancé is not E.A.'s father.

{¶ 8} In the beginning of October, A.A. switched to working the afternoon shift, and at that point found appellant to babysit E.A. A.A. learned of appellant through social media and through her team leader at work. Appellant agreed to watch E.A. for $20 a day, beginning on October 27, 2014. According to A.A., appellant was the only babysitter for E.A. from October 27, 2014, through December 10, 2014, and she watched him every weekday, except for two days near Thanksgiving and on December 5, 2014.

{¶ 9} On the night of the incident, A.A. received a call at work that E.A. was being transported to Bellevue Hospital because he had fallen off of the couch. When A.A. arrived at the hospital, she learned that there was some old fluid on E.A.'s brain, and that he was going to be transported by helicopter to Mercy St. Vincent's Hospital in Toledo, Ohio. A.A. left to drive to the hospital in Toledo, and on her way out, saw appellant and appellant's husband. A.A. testified that appellant hugged her, and said "I'm so sorry, I never would hurt him," and kept repeating "I'm so sorry." Notably, the medical records from Bellevue Hospital contained a report from the treating physician, Dr. Jeffrey Pay, which included the following:

Clyde police had called me in the ER and they confirmed the story that the babysitter had told me. They do not think there is any evidence of child abuse or foul play per policeman who I had spoken to, I did not get 12/10/2014 (sic). [M]other and babysitter were in the Emergency Room,

4.

both for (sic) acting appropriate, despite the CT of the brain reading, I do not have any suspicion of abuse or neglect by either the mother and (sic) babysitter. Both are very tearful, both are very upset at the condition.

{¶ 10} A.A. testified that E.A. was in the hospital for eight days. On December 11, 2014, the day after the incident, E.A. began having seizures that affected the right side of his body. E.A. was placed on medication to control the seizures, and A.A. testified that she has been told that it is probable that E.A. will need to be on that medication for the rest of his life. A.A. also testified that E.A. suffered damage to the nerves from his brain to his mouth, which makes it difficult to speak. She stated that at the time of the trial he was just over two years old, and was not speaking. A.A. testified that E.A. was receiving a number of services, but it was not yet known what the lasting impact of his injuries would be.

{¶ 11} The next witness to testify for the state was Detective Brian Weaver of the Clyde Police Department. Weaver interviewed appellant on the night of the incident, and authenticated the audio of the interview that was played for the jury.

{¶ 12} In the interview, appellant stated that she was watching E.A., and it was time to feed him around 7:30 p.m. She was sitting with E.A. on the couch, and was getting ready to change him before feeding him. Appellant stated that she had his pajamas with her, but forgot his diaper. So, she laid him on the couch while she left to get a diaper which was about twenty feet away in the hallway. While she was getting the diaper, she heard a thud and then heard E.A. start to scream. Appellant ran back to the

5.

room and saw E.A. face down on the floor with one leg tucked up underneath him. She stated that she immediately grabbed him and quickly picked him up, and when she did his head snapped back and hit her shoulder, which made appellant "freak out." E.A. was still crying, so appellant placed him on the changing table and looked him over to make sure he was not bleeding. Appellant described that E.A. was crying like he does when he is hungry, not like a "bloodcurdling" scream like something was wrong. Appellant, thinking that E.A. was okay, then changed his diaper and put on his pajamas.

{¶ 13} Appellant then stated that she picked E.A. up and carried him into the kitchen where she was going to make his bottle. At that point, E.A.'s head started to bobble, and appellant noticed that he was whimpering and not looking around, and "not acting right at all." Appellant took E.A. back into the living room and got the car seat to take him to the hospital, but realized she could not do that because her husband was out of the house, and there were two other little children there. Appellant then called 911.

{¶ 14} Appellant described E.A.'s behavior as "typical baby" before the incident. She also stated that E.A. was starting to fuss, but was not crying when she left to get the diaper. Appellant admitted that she never should have walked away with E.A. on the sofa, and that although he was not rolling over yet, when he was on the floor he had started to scoot himself around in a circle.

{¶ 15} Appellant did not go with E.A. in the ambulance to the hospital. Instead, the police told her to wait until someone could drive her because she was very upset. Appellant waited until her husband came back home, and his mother came over to watch

6.

the children, and then she went to the hospital where she explained to the doctor everything that had happened.

{¶ 16} Weaver then asked appellant if this was an instance of shaken baby syndrome, whether the child was crying so violently that she just wanted to shut him up. Appellant categorically denied that accusation. Weaver then asked appellant if they were going to find any other bruises or grip marks, or anything else on the baby, to which appellant replied "absolutely not."

{¶ 17} Appellant and Weaver then discussed how a baby would fall off of a couch. Weaver asked if a pillow in front of the child would have prevented him from falling off, and appellant said it would not have if he was upset. Weaver then asked appellant if E.A. was upset, and she replied that he was. Appellant explained that it was time for E.A. to eat and whenever he gets hungry and she leaves his presence he cries, and when he cries he kicks. She wondered if his kicking caused him to slide off of her leather couch.

{¶ 18} Weaver then had appellant describe exactly how E.A. was positioned on the couch, and where he was when she found him after he fell. A diagram from this discussion was entered into evidence, as well as pictures of the house and the couch.

{¶ 19} At this point, the interview was interrupted, and Weaver left to take a phone call. When he returned, he informed appellant that he was just told by someone at Bellevue Hospital that E.A. has experienced new and old brain bleeds, which is indicative of the child being abused or hit on the head. Weaver then asked appellant if she had ever seen, heard, suspected, or done anything concerning abuse to E.A., which appellant swore

7.

that she had not. She stated that this was the first time that anything has ever happened to E.A. in her home. Appellant then began crying and asked if this was all from him falling and her picking him up. Through sobs she recounted that she told the physicians at Bellevue that she thought she might have done something when she picked E.A. up so fast, and that they told her that she never should have picked him up, but that she thought she was acting on instinct and doing the right thing by picking him up.

{¶ 20} Weaver then asked appellant if there was ever any other time where she picked E.A. up and he hit his head, or if any of the other children hit him in the head with something. Appellant replied that there was not. She stated that E.A. has never arrived with bruises or anything to indicate that someone was hurting him, but she offered that she does not watch him every day. Appellant noted that over the last several weeks, she has not watched him every weekday as per the regular schedule. When asked who else has watched the child, appellant offered E.A.'s grandmother, A.A.'s fiancé, and A.A.'s fiancé's sister. Weaver then asked one more time whether appellant has ever shaken E.A., to which she replied "Oh, god, no."

{¶ 21} After the recorded interview was finished playing, Weaver explained the diagram that he drew of the scene as described by appellant in the interview. Weaver then clarified the dates that appellant watched E.A., in that she did not have him on October 31, November 10, 18, 27, and 28, and December 5, 2014. Weaver testified that the only other investigation he did on the case was to collect the medical records.

8.

{¶ 22} Following Weaver's testimony, but before cross-examination, the state played the recorded 911 call from the night of the incident. On the call, appellant is audibly distraught and hysterical throughout. She told the operator that E.A. fell off of the couch, and that he was breathing but was not responding. Appellant can be heard talking to E.A., trying to get him to respond, and she can also be heard sobbing. She said when he yelled she yanked him up and his head went back, and she hoped she did not do anything to him. Appellant said that E.A. fell about a foot or a foot and one-half. She described that he was not bleeding, and did not have any bumps or anything on his head. The call ended when the police arrived on the scene.

{¶ 23} Weaver was then subjected to cross-examination the next morning of trial. On cross-examination, Weaver admitted that he was aware that the child had an old brain bleed, but he did not ask any questions regarding the significance of that fact. Weaver also testified that he asked A.A. whether there were any suspects, but that A.A. had none to offer, and he did not ask for the names of the people who had watched E.A. prior to December 10, 2014. Weaver testified that, as of December 12, 2014, when he received the report from Dr. Randall Schlievert, Director of the Child Abuse Program, and Regional Vice President for Academic Affairs and Research Programs at Mercy in Toledo, Ohio, which stated that the new brain bleed was caused in the care of appellant, he did no further investigation. Weaver acknowledged that the investigation was concluded abruptly, and that no inquiry was made into the cause of the previous injury.

{¶ 24} The final witness to testify for the state was Dr. Schlievert. Schlievert testified that shaken baby syndrome is characterized by a constellation of injuries caused by violent and repetitive shaking of an infant, including bleeding between the brain and the skull, direct injury to the brain, retinal hemorrhaging, and, infrequently, fractures of the ribs, arms, or legs. Schlievert stated that in about half of the cases there are no external signs of injury, such as bruising. Schlievert also testified that shaken baby syndrome generally requires an adult or caregiver who is unable to cope with a crying or challenging infant, or who is experiencing frustration or a difficult relationship. Notably, on cross-examination, Schlievert acknowledged that he did not have any evidence that appellant was experiencing any of those difficulties, or that she was unable to cope with E.A.

{¶ 25} Schlievert testified that he examined E.A. on the night of the incident, and that scans taken at Bellevue Hospital revealed that E.A. had intracranial bleeding. Schlievert testified that for a fall to cause that type of injury it would need to be a long drop of 10 to 12 feet; a short fall from a couch would not cause life-altering brain damage. In support of this point, Schlievert cited a study that was published in 1993 that examined 207 children under the age of five that fell out of cribs or beds in the hospital. Of the 130 infants in the study, each of whom fell 32 inches onto a hard floor, only one child had a skull fracture, and there was no evidence of bleeding on the brain or brain damage. Relating that study to the present case, Schlievert testified that he could confidently rule out a short fall from a couch as the cause of E.A.'s injuries. He further

10.

noted that there were no external signs of an impact or a fall—there were no bruises or bumps on the skull—which he would expect if the fall were significant enough to cause E.A.'s injuries.

{¶ 26} Schlievert also testified that the scans taken of E.A.'s brain also revealed an older injury. The older injury was characterized by bleeding on both sides of the brain, and the new injury had bleeding primarily on the left side of the brain, but with a little bleeding also on the right side. Based on the scans, Schlievert could conclude that the older injury was one week to several weeks old, and the new injury was "fresh." Schlievert testified that the way to determine when an injury occurred is dependent on when the symptoms manifest. Citing a study published in 2013, and another article published in 2014, he explained that once the brain is injured, symptoms manifest immediately. In E.A.'s case, the symptoms included a decrease in consciousness, bobbing head, no response to normal stimuli, and then, over time, weakness on the right side of his body. Schlievert concluded that because E.A. was not exhibiting any of those symptoms before he was left with appellant, the injury must have occurred while E.A. was in appellant's care.

{¶ 27} In addition, Schlievert testified that the examination of E.A. also revealed multilayer retinal hemorrhages in both eyes, which is consistent with abusive head trauma, otherwise known as shaken baby syndrome. Schlievert could not precisely date those injuries, but he testified that given the time they took to heal, it appears to be a

11.

fresher case, and he would not expect the injuries to have occurred more than a month before the incident.

{¶ 28} Schlievert then commented on whether the prior injury could have contributed to the symptoms that were caused by the injury on December 10, 2014. Schlievert noted that because of the nature of babies, their symptoms from abusive head trauma can be very vague, and can be overlooked or misdiagnosed. He noted that in a study published in 1999, 31 percent of the children who were found to have abusive head trauma had evidence of a prior brain bleed that was missed. Schlievert then remarked that it is debated in the field whether an older injury can make a child more fragile or more likely to suffer a serious injury from a mild fall later. He noted that many doctors believe that they may have seen such a case, but there is not a single published article that proves that that happens. Schlievert expounded that in all of the cases that he is aware of, the injuries that resulted from a second incident with a preexisting injury are mild; the head may grow larger because of the presence of the blood, but the children are not collapsing, or falling off of their developmental curve, or weak on the right side, or having trouble with speech or language.

{¶ 29} Finally, Schlievert testified that it was his conclusion to a reasonable degree of medical certainty that E.A. suffered two episodes of abusive head trauma, with the first one being relatively mild compared to the second one, and based on the onset of the symptoms, the second episode occurred immediately prior to the 911 call for help.

12.

{¶ 30} After Schlievert's testimony and the admission of evidence, the state rested its case. Appellant then moved for acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶ 31} Thereafter, appellant presented her defense, and called Dr. Marcus DeGraw as her only witness. DeGraw is a board certified child abuse pediatrician, and is the Medical Director of the Child Protection Team and Ambulatory Pediatrics at the St. John Providence Children's Hospital in Detroit, Michigan.

{¶ 32} DeGraw reviewed the medical records in this case, and agreed that E.A. suffered two distinct injuries. The first being a couple of weeks old, and the second being recent. DeGraw specified that the second injury could have occurred within seconds of the symptoms manifesting, or up to a couple of days before. DeGraw testified that the first injury caused E.A. to be more susceptible to injury from the second incident because as the existing pocket of blood between the skull and the brain healed, it was weaker and more sensitive such that a minor trauma that would not normally cause bleeding, could cause the injured area to bleed again. DeGraw explained that children with a prior injury are not necessarily more fragile, but are more susceptible to having more problems if they suffer additional trauma. DeGraw testified that one explanation for the new injury in this case—he specifically notes that no explanation has been sought for the old injury—is that E.A. suffered a traumatic re-injury to the location of the old injury when he fell and struck his head on the hard surface of the floor. DeGraw further commented on redirect

13.

that he would not expect the act of appellant quickly picking up E.A., and E.A.'s head striking her shoulder, to significantly contribute to the intracranial bleeding.

{¶ 33} DeGraw next testified that he found it remarkable that Schlievert concluded, based solely on the symptoms, that E.A. suffered abusive head trauma by appellant. DeGraw queried how Schlievert could blame one person for one injury, but ignore the other injury. DeGraw also criticized Schlievert for highlighting appellant as a possible perpetrator; DeGraw stated that the role of a medical professional is to interpret injuries, how they occur, and when they might have occurred to give information to investigators, not to opine on who committed the act.

{¶ 34} DeGraw then testified regarding the retinal hemorrhaging. He testified that a short fall from the couch would not cause retinal hemorrhaging, even considering the prior subdural bleeding. However, he testified that the retinal hemorrhaging could have occurred at the same time as the prior injury. Consistent with Schlievert, he noted that there is no way to determine the age of the retinal hemorrhaging, and whether it occurred with the old or the new trauma.

{¶ 35} On cross-examination, DeGraw added that it is not uncommon for a fall to cause intracranial bleeding, but yet not leave any marks or bruising on the outside of the scalp. He also testified regarding the symptoms that E.A. displayed on December 10, 2014, which included a loss of consciousness, having a mental status change, inappropriate reactiveness, and difficulty responding. He testified, however, that by the time E.A. reached Bellevue Hospital, his examination was much more normalized.

14.

{¶ 36} Following DeGraw's testimony, the defense rested. After closing arguments and instruction from the court, the jury retired to deliberate, and returned with a verdict of guilty as to both the count of felonious assault and the count of child endangering. Thereafter, the trial court continued the matter for preparation of a presentence investigation report.

{¶ 37} At sentencing, the trial court found that the two offenses were allied offenses of similar import, and the state elected to proceed to sentencing on the count of felonious assault. On that count, the trial court ordered appellant to serve eight years in prison.

## II. Assignment of Error

{¶ 38} Appellant has timely appealed the judgment of conviction, and now asserts one assignment of error for our review:

I. Chantal Thoss's felonious assault conviction is against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 10 and 16, of the Ohio Constitution.

## III. Analysis

{¶ 39} In reviewing a conviction as being against the manifest weight of the evidence, the court, acting as a "thirteenth juror," must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "We do not view the evidence in a light most favorable to the state." *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 39. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. "Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *Roberson* at ¶ 39, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 40} Upon our review of the record in our role as the thirteenth juror, we find that this is the exceptional case in which the jury's finding that appellant shook E.A. beyond a reasonable doubt is against the manifest weight of the evidence. Here, the jury found appellant guilty of felonious assault in violation of R.C. 2903.11(A)(1), which provides "No person shall knowingly * * * [c]ause serious physical harm to another," and endangering children in violation of R.C. 2919.22(A), which provides "No person * * * in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." In support of the charges, the state presented evidence to prove its theory that this was a

case of shaken baby syndrome, and because the symptoms manifested themselves while E.A. was in appellant's care, appellant must have been the perpetrator. In particular, the state's case rested on the testimony of Dr. Schlievert.

{¶ 41} Although Schlievert testified that in his opinion, to a reasonable degree of medical certainty, E.A.'s injuries on December 10, 2014, were caused by violent, repetitive shaking, we find that there are several considerations that give rise to doubt regarding his conclusion.

{¶ 42} First, Schlievert testified that shaken baby syndrome generally requires a caregiver that cannot cope with a crying or challenging infant, or a caregiver who was experiencing frustration or a difficult relationship. However, Schlievert admitted that he had no evidence that appellant was experiencing any of those difficulties, and there was no other evidence presented at trial that E.A. was a particularly challenging infant or that appellant was frustrated or in a stressful relationship.

{¶ 43} Second, although Schlievert testified that a short fall from a couch would not cause the injuries that E.A. suffered, that conclusion was based on studies that were not revealed to have involved children who had experienced recent prior brain trauma. Further, when asked whether recent prior trauma could make a child more vulnerable, Schlievert acknowledged that while there are no articles proving that it happens, many doctors believe that they might have seen cases of that happening; however, to his knowledge, the injuries caused by the second trauma are relatively mild, but may include another bleed in the brain and the head growing larger due to the presence of the blood.

17.

{¶ 44} Third, Schlievert's testimony regarding the presence of retinal hemorrhaging is nothing more than inconclusive. Both Schlievert and DeGraw testified that it was impossible to determine whether the retinal hemorrhaging occurred on December 10, 2014, or at the time of the first trauma.

{¶ 45} Finally, although not seen in the majority of cases, there were no other injuries to E.A. that would be indicative of shaken baby syndrome, i.e., no injuries to the neck, no broken arms or legs, and no bruising on the limbs or the chest.

{¶ 46} Not only do we have some doubt regarding Schlievert's conclusion, but we also find appellant's recorded statements and the expert testimony of DeGraw to be believable. Regarding the latter, we are persuaded by DeGraw's expert testimony that E.A.'s symptoms could have been caused by a fall off of the couch that aggravated a prior brain injury, which led to subsequent bleeding and complications.

{¶ 47} Regarding the former, we find appellant's recorded statements to be credible. As part of our reasoning, we note that appellant's version of the events remained consistent through the 911 call, appellant's first encounter with Officer Widman, the history given to the initial treating physician, Dr. Pay, and ending with her interview with Detective Weaver, with the exception of a discrepancy regarding whether E.A. was found on his back as recounted by Widman, or on his stomach as told by appellant to Weaver. Further, we find it significant that Pay, who spoke with appellant on the night of the incident, reported that he had no suspicion of abuse or neglect by

18.

either appellant or A.A., and he included in his notes that the police informed him at the time that they also had no evidence of foul play or child abuse.

{¶ 48} Moreover, we find that appellant's behavior following the incident, in calling 911, going to the hospital, and speaking with A.A., and her demeanor on both the 911 call and the recorded police interview are sufficiently credible to create doubt regarding whether she violently shook E.A. In particular, we are struck by what we heard in the audio recordings. Notably, while we normally extend deference to the jury's credibility determinations because, as we recognized above, the jury is able to see the witnesses testify, observe their facial expressions and body language, hear their voice inflections, and discern qualities such as hesitancy, equivocation, and candor, in this case the jury had no advantage over this court because we have listened to the same audio recordings that were presented to the jury—the jury did not *see* or *hear* anything more than this court. From those recordings, it is evident to us, acting in this instance as the thirteenth juror, that appellant wholeheartedly believed that she caused injury to E.A. not by shaking him, but by placing him on the couch while retrieving his diaper and by her instinctual response of picking him up off the floor after he had fallen. We could hear the raw emotion in appellant's voice as she reported the child's condition to the 911 operator, the self-condemnation over the decision to briefly leave him unattended on the couch, the genuine surprise upon being informed by Weaver that E.A. had signs of previous injury, and her struggle to understand how this incident produced the injuries suffered by E.A.

Simply stated, we are not convinced that appellant was lying when she recounted her version of what happened to E.A.

{¶ 49} In sum, this case presents us with the rare situation where appellant's conviction was based entirely on the opinion of one person, Dr. Schlievert. Schlievert examined E.A. on the night of the incident, and concluded not only that E.A. had suffered shaken baby syndrome, but that appellant was the perpetrator. Upon Schlievert's conclusion, all criminal investigation into the cause of E.A.'s injuries stopped. No inquiry was made into the other people who had cared for E.A., and, astonishingly, no inquiry was made into the cause of E.A.'s prior injury. However, Schlievert's conclusion and its subsequent impact on the investigation was strongly criticized by DeGraw, who testified that (1) the newer injury could only be roughly timed as occurring within seconds of *or up to a couple of days before* E.A. exhibited symptoms, and (2) given the older injury, E.A. was more susceptible to new injury from a trauma—such as a fall from a couch—that would normally not produce serious injury. He also explained that the retinal hemorrhaging observed in E.A.'s scans could be several weeks old. But more significant to our decision here, DeGraw identified aspects of Schlievert's report that he found "remarkable," and in doing so, fairly articulated that which we also find concerning. He testified that it was remarkable,

> [M]ainly, that a determination was made, not just by [Dr. Schlievert], but [by the] investigators[,] that the child suffered from Abusive Head Trauma at the hands of the last caregiver prior to being

present[ed] to the hospital, and they did so based solely on symptoms. Another piece of that then is I have yet to see anybody comment on how this child sustained the old injury. How can we blame one person for one injury, but ignore the other injury? Another piece of that then is if we're to say, I believe this person has done something, but a child has another injury, is it likely that this child was abused by two people or suffered two injuries or was abused by one and had an injury earlier, or is it likely that there's somebody else who abused the child potentially twice, or could the child have been abused and then subsequently suffered an injury that was accidental. These are all possibilities that we work—our job is to tease out. Another piece is, I look at my job—and I was trained at the same place Dr. Schlievert was in Cincinnati by people who taught me that my job is not to be an investigator. My job is not to highlight a possible perpetrator. My job is not to determine guilt or not. My job is to help investigators. I have nothing to do with the potential for who did what. My job is to interpret injuries, what's there, what's not, how they occur, how they don't, when they might have occurred to give information to investigators, and really, the ultimate determination of who did what is Judge or jury, depending on what's involved, and * * * I don't agree when professionals like myself

interject opinions on who did something. That—that, I don't think is appropriate for my profession.[1]

{¶ 50} Here, Schlievert's opinion brought an abrupt halt to the investigation, despite the fact that the child had sustained a prior unexplained brain injury, and despite the fact that another expert subsequently opined that the newer injury could only be roughly timed to within a few seconds or up to a couple of days before E.A. exhibited symptoms.

{¶ 51} Although Schlievert may have been convinced that appellant was the perpetrator, the determination of guilt in criminal proceedings is not left to treating physicians, police detectives, or expert witnesses, but instead is left initially to the trier of fact, and then reviewed by us as the thirteenth juror on appeal. In exercising our duty in that role, we have carefully examined the record, and we find that the totality of the evidence weighs heavily against appellant's conviction.

{¶ 52} We do not reach this result lightly, and we do not go so far as to proclaim appellant's innocence. Rather, "not forgetting the ancient and merciful rule of the common law that it is better that ninety and nine guilty ones should go unpunished than

---

[1] Similar to the concerns articulated by DeGraw, this court has recognized that medical professionals overstep their role when they provide their opinions to the jury as to the identity of the perpetrator of child abuse. *See State v. Weaver*, 178 Ohio App.3d 504, 2008-Ohio-5022, 898 N.E.2d 1023, ¶ 80-132 (6th Dist.) (reversible error to allow expert testimony from doctors that it was their medical opinion that the child-victim was poisoned by the defendant, his mother, who was one of the victim's several caregivers, since a jury is capable of "undertaking such an analysis and making a determination of who, if anyone," poisoned the child).

22.

that one innocent person should suffer," *Lamprecht v. State*, 84 Ohio St. 32, 49, 95 N.E. 656 (1911), we find that the doubt surrounding Schlievert's conclusion, the believability of DeGraw's explanation, the presence of Pay's report that he and the responding officers did not suspect abuse, and the credibility of appellant's actions and recorded statements lead us to the conclusion that the jury lost its way and committed a manifest miscarriage of justice when it found that appellant committed the alleged crimes beyond a reasonable doubt. Therefore, we hold that appellant's conviction is against the manifest weight of the evidence.

{¶ 53} Accordingly, appellant's assignment of error is well-taken.

### IV. Conclusion

{¶ 54} For the foregoing reasons, the judgment of the Sandusky County Court of Common Pleas is reversed, and this matter is remanded for a new trial. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

23.

Mark L. Pietrykowski, J.    _____
               JUDGE

James D. Jensen, J.

              _____

Christine E. Mayle, P.J.        JUDGE
CONCUR.

              _____
               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.