[Cite as *State v. Nelson*, 2023-Ohio-1095.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                             Court of Appeals No.  L-22-1080

　　　　Appellee                                     Trial Court No.  CR0202001498

v.

Ronnie Nelson                                         **DECISION AND JUDGMENT**

　　　　Appellant                                    Decided:  March 31, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a jury trial, defendant-appellant, Ronnie Nelson, appeals the

March 22, 2022 judgment of the Lucas County Court of Common Pleas, convicting him

of murder and felonious assault, and sentencing him to an indefinite term of 15 years to

life in prison.  For the following reasons, we affirm the trial court judgment.

# I.    Background

{¶ 2} On March 9, 2020, six-month-old A.P. stopped breathing while in the care of her uncle, Ronnie Nelson. He called 9-1-1, and attempts were made to resuscitate her, but A.P. was pronounced dead at the University of Toledo Medical Center approximately one hour after Nelson called 9-1-1. The coroner concluded that A.P.'s death was a homicide and the cause of her death was abusive head trauma. Nelson was charged with murder in the commission of or in attempting to commit a first or second-degree felony, a violation of R.C. 2903.02(B) and 2929.02 (Count 1); felonious assault, a violation of R.C. 2903.11(A)(1) and (D) (Count 2); and endangering children, a violation of R.C. 2919.22(B)(1), (E)(1), and (E)(2)(d) (Count 3). The case was tried to a jury and the following evidence was presented.

{¶ 3} Aj.P. and D.P. are the parents of A.P., who was born on September 7, 2019. Both were employed outside the home, so Aj.P.'s sister, K.N., babysat A.P. two or three times per week. Nelson is K.N.'s husband. On March 9, 2020, Aj.P. dropped A.P. off at K.N.'s home sometime between 7:00 and 7:45 a.m. A.P. had been sick over the past two weeks—she was fussy, crying, vomiting, and wouldn't eat or sleep—but that morning she was smiling and laughing and acting more like herself.

{¶ 4} K.N. left A.P. home alone with Nelson while she dropped her children off at school and went to a 9:00 a.m. physical therapy appointment. Nelson said he tried to feed A.P., but she wouldn't take a bottle. He put her down and checked on one of his

2.

other children who was on the other side of the home. He returned to A.P., laid her down in a rocker, and sat on the bed to watch television. The next time he observed A.P., she was not breathing. Nelson called his wife at 10:04:50 a.m., and told her to come home immediately, then he called 9-1-1 at 10:05:15 a.m.

{¶ 5} Emergency crews arrived at Nelson's home within minutes and immediately recognized that A.P. was not breathing and had no pulse. They began efforts to resuscitate her, including CPR, bag-and-mask ventilation, epinephrine administered into the bone marrow through an intraosseous needle, and intubation—all to no avail. A.P. was transported to the nearest hospital, UTMC, where life-saving measures continued, but were unsuccessful. A.P. was pronounced dead at 11:04 a.m.

{¶ 6} The emergency department physician noted that A.P. had no obvious broken bones, lacerations, bruises, or bleeding, but her fonatanelle was full or bulging, signifying swelling of the brain and indicating head injury or trauma. The case was referred to the Lucas County Coroner's office.

{¶ 7} Deputy coroner, Dr. Thomas Blomquist, performed A.P.'s autopsy. He saw no external signs of injury and no fractures, but upon internal examination, he saw three contusions: one on A.P.'s forehead, one at the apex of her head, and one deep in the soft muscle at the back of A.P.'s head at the base of her skull. Dr. Blomquist said that these three contusions were three separate points of blunt force injury. These injuries can occur when the surface of the brain, including its membranes, hit up against the side of

3.

the skull. Dr. Blomquist could not say that the contusions had been caused that morning, but estimated that they were inflicted within days of A.P.'s death and possibly even immediately before.

{¶ 8} There was a large amount of blood—both fresh blood on the brain (subdural hemorrhage) and acute blood clots adherent to the surface of the brain (subdural clots). There was also blood beneath the arachnoid membranes (subarachnoid hemorrhage) that could have occurred within days to a week before A.P.'s death. The fresh subdural hemorrhage and acute clots were only a few hours to a day old and were life-threatening.

{¶ 9} The injuries that resulted in the subdural and subarachnoid hemorrhages could have been inflicted at the same time, but it was also possible that they were not. Dr. Blomquist captured a total of 75 cc of blood, but more blood escaped and soaked into the towel beneath the baby's body. A loss of 50 cc of blood is considered life-threatening. Dr. Blomquist could not say that the contusions he observed were related to the bleeding or shearing injuries.

{¶ 10} After removing A.P.'s brain, Dr. Blomquist examined the dura mater and observed blood that had adhered to the surface of the dura. There was a remote subarachnoid hemorrhage over the right frontal lobe that was more than eight days old. Dr. Blomquist also observed yellow discoloration—hematoiden—indicative of injuries that occurred more than 18 hours earlier; these older injuries did not cause A.P.'s death and could, in fact, have occurred at birth.

4.

{¶ 11} Dr. Blomquist visualized the spinal cord and saw an acute hemorrhage of the cervical spine and a portion of the upper thoracic spine. This could have been leakage from the subdural hemorrhage that coated the brain or could have been an additional injury. A microscopic examination was required to determine whether it was blood that had leaked down or was an independent point of injury. Once he removed the spinal cord, Dr. Blomquist observed adherent subdural blood and a subarachnoid hemorrhage over the spinal cord that would not have simply leaked down from the brain.

{¶ 12} Dr. Blomquist examined A.P.'s eyes and optic nerves. There were hemorrhages around the optic cups at the back of both eyes at the point where the optical nerves attach to the back of the eyes. These injuries are indicative of back-and-forth movement that creates shear force.

{¶ 13} To determine whether there was injury to the spinal cord roots, Dr. Blomquist prepared tissue samples of the brain to be examined microscopically. The process for doing so required that the brain be fixed in formalin for "at least two weeks, or at least until it is firm enough." The tissue was sectioned, and the samples were placed in cassettes and clarified and infiltrated with paraffin to fix the cellular components in place. Dr. Blomquist then examined the samples under a microscope for evidence of axon injury and vascular injury at the white matter tracks around the basal ganglia, the corpus callosum, and the cerebellar peduncles—shear force points.

5.

{¶ 14} Dr. Blomquist discovered tissue tearing with hemorrhage and fibrin vascular injury in the left basal ganglia and left side of the corpus callosum. He described what he saw as grade four diffuse axonal injury (or diffuse vascular injury), which would have caused A.P. to immediately lose consciousness, become unresponsive, and go into respiratory and cardiac arrest. Dr. Blomquist also saw focused damage around the nerve roots, which can be caused by the brain moving back and forth and tugging on the spinal cord. The acute subdural hemorrhage involving the cervical nerve roots would have caused A.P. to stop breathing and would have caused her death within a matter of minutes.

{¶ 15} After completing A.P.'s autopsy and after receiving all ancillary studies, Dr. Blomquist determined that her manner of death was homicide, and her cause of death was abusive head trauma, which occurred within minutes, and was the result of child abuse.

{¶ 16} Detectives extracted information from Nelson's phone, which showed his google search history for March 9, 2020, starting around an hour after A.P. had been declared dead. Nelson searched "shaken baby syndrome," "paralisys" [sic], "autopsy definition," "blood coming out of a baby nose," "what an autopsy shows," and "how long do autopsies take." Nelson told detectives that he had "started looking at these things after other people had told [him] things." Nelson denied shaking or hurting A.P.

6.

{¶ 17} The jury found Nelson guilty of Counts 1 and 2. The state requested a nolle prosequi of Count 3. Counts 1 and 2 merged for purposes of sentencing, and the state elected to have Nelson sentenced on Count 1. The court sentenced Nelson to an indefinite term of 15 years to life in prison. Nelson's conviction and sentence were memorialized in a judgment journalized on March 22, 2022.

{¶ 18} Nelson appealed. He assigns the following errors for our review:

Assignment of Error I: Nelson suffered ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution, when his trial counsel failed to object to, or seek an expert witness to counter, the medical examiner's findings of axon tears when testimony revealed the medical examiner failed to follow proper procedures in the examination of A.P.'s brain.

Assignment of Error II: The finding of guilt was against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 10 and 16, of the Ohio Constitution.

## II.    Law and Analysis

{¶ 19} In his first assignment of error, Nelson argues that his counsel was ineffective for failing to (1) question Dr. Blomquist concerning his alleged failure to

7.

follow proper protocol in examining A.P.'s brain, and (2) request time to consult an expert witness concerning this same issue. In his second assignment of error, he claims that his conviction was against the manifest weight of the evidence. We consider each of Nelson's assignments in turn.

## A. Ineffective Assistance

{¶ 20} Dr. Blomquist testified that in preparing tissue samples for microscopic examination, he first needed to fix A.P.'s brain in formalin "for at least two weeks, or at least until it is firm enough." He would then section the tissue and examine it for injury. Nelson argues that because he was arrested only nine days after the autopsy, Dr. Blomquist could not have waited the required time before sectioning the tissue. He claims in his first assignment of error that defense counsel was ineffective for (1) failing to question Dr. Blomquist about whether he ensured that the brain was firm enough before sectioning the tissue, and (2) failing to request time to consult with a defense expert to ensure that the brain sat in the formalin for a sufficient amount of time. Nelson insists that because this microscopic analysis of the tissue formed the basis for Dr. Blomquist's opinion that A.P.'s injury resulted in her immediate death—and because Nelson was alone with A.P. for at least an hour before A.P. died—defense counsel's failure to challenge the procedure severely prejudiced his defense.

{¶ 21} The state responds that Nelson's argument relies on two analytical errors: (1) that he could not have been indicted until the autopsy was completed, and (2) that the

8.

14-day time period was a fixed requirement and not an estimated time period. As to the first analytical error, the state maintains that Nelson was indicted based on the initial autopsy findings, including the amount of blood that came from the skull, the coroner's opinion that the head injuries resulted in death within minutes of being inflicted, and the fact that Nelson was the only adult present when the events occurred. It claims that trial counsel made a tactical decision not to challenge the autopsy protocol. As to the second analytical error, the state insists that two weeks was the *approximate* time required for sectioning the tissue. It also maintains that whether to call a medical expert is a matter of trial strategy and it is only speculative that a medical expert would have supported Nelson's autopsy-protocol theory.

{¶ 22} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

9.

{¶ 23} *Strickland* recognizes that there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 11th Dist. Ashtabula No. 2003-A-0076, 2005-Ohio-3775, ¶ 8, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160, 542 N.E.2d 707 (1988).

{¶ 24} A.P. died on May 9, 2020. Her autopsy examination was performed on May 10, 2020, and the coroner's verdict was issued on May 22, 2020. Nelson was indicted on May 19, 2020. But it does not logically follow that because Nelson was indicted less than 14 days after the autopsy, Dr. Blomquist must not have allowed sufficient time for the brain to fix in formalin. This is true for two reasons. First, the state was not required to wait for a completed autopsy before criminally charging Nelson—it could indict Nelson before Dr. Blomquist finished his microscopic examination of the brain. Second, Dr. Blomquist testified that the brain must be fixed in formalin "for at least two weeks, *or at least until it is firm enough*." (Emphasis added.)

10.

It was clear from his testimony that 14 days was an approximation of the time required before sectioning the brain. It may have taken less time for the brain to become firm enough.

{¶ 25} In any event, "[d]eciding whether or not to call an expert witness is solely a matter of trial strategy." *State v. Phillips*, 6th Dist. Wood No. WD-16-020, 2017-Ohio-7107, ¶ 48, citing *State v. Jackson,* 10th Dist. Franklin No. 02AP-867, 2003-Ohio-6183, ¶ 76. "Indeed, 'trial counsel's decision not to seek expert testimony is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'" *Id.* The same is true with respect to the scope of cross-examination. "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, citing *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell*, 90 Ohio St.3d 320, 339, 738 N.E.2d 1178 (2000).

{¶ 26} Here, it is entirely possible that defense counsel considered and decided against cross-examining or consulting an expert on this issue because he already knew that it would not be fruitful. Regardless of the reason, we conclude that trial counsel's decision not to question Dr. Blomquist about whether he ensured that the brain was firm enough and not to request time to consult with a defense expert on this issue, constituted trial strategy that does not amount to ineffective assistance.

11.

{¶ 27} We find Nelson's first assignment of error not well-taken.

## B. Manifest Weight

{¶ 28} In his second assignment of error, Nelson argues that his conviction was against the manifest weight of the evidence. He claims that (1) A.P. had older trauma that could have damaged A.P.'s vessels such that when Nelson rocked her, the fatal injury occurred; (2) the police failed to investigate anyone but Nelson even though A.P. had injuries that ranged from one to eight days old; (3) Nelson remained a credible witness throughout the entirety of the case; and (4) there was no evidence that Nelson harmed A.P. in the past. Nelson suggests that this case is comparable to *State v. Thoss*, 120 N.E.3d 1274, 2018-Ohio-4051 (6th Dist.), an abusive head trauma case, where this court reversed Thoss's conviction because it was against the manifest weight of the evidence.

{¶ 29} The state responds that (1) Nelson cites no evidence or expert testimony to support his theory that he disrupted an older injury inflicted by someone else when he rocked A.P.; (2) given the autopsy evidence as to the timing of A.P.'s injury, there was no other scenario for police to investigate, and Nelson himself could have inflicted the older injuries; (3) Nelson conducted suspicious internet searches soon after A.P.'s cardiac arrest; and (4) *Thoss* is distinguishable.

{¶ 30} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences,

12.

consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 31} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 32} Here, there was uncontradicted evidence that the blunt force injuries that caused A.P.'s death were inflicted within minutes of her death. A.P. was in Nelson's sole care for more than an hour before she stopped breathing. In the absence of some other explanation for her injuries, Nelson was the only person who could have inflicted them.

13.

While it is true that the autopsy revealed older injuries, Dr. Blomquist testified that those older injuries did not cause A.P.'s death. While it is disturbing to imagine that this was not the first time that A.P. had been physically harmed, the only injuries at issue at trial were the ones that led to her death. The autopsy results showed that only Nelson could have inflicted those injuries because he was the only adult who was with A.P. in the minutes leading up to her death.

{¶ 33} Nelson claims that A.P.'s older trauma could have damaged her vessels such that when Nelson rocked her, the fatal injury occurred. There is no evidence in the record to support that assertion. Defense counsel did ask Dr. Blomquist if the older injuries could have "ma[d]e the tensile strength of other tissues weaker," but Dr. Blomquist responded that it would not have made a difference clinically. The jury was provided no evidence from which it could conclude that previously-inflicted injuries played a role in A.P.'s death.

{¶ 34} As for Nelson's citation to *Thoss*, where we reversed on manifest-weight, we agree with the state that *Thoss* is distinguishable. In *Thoss*, there were competing expert opinions as to the timing of the baby's injuries; the state's expert provided inappropriate testimony opining that the defendant committed the crime; and we had access to the same evidence presented to the jury—recordings of the defendant's statements—thus the jury had no advantage over this court in making credibility determinations. The same is not true in this case. Here, Dr. Blomquist testified

unequivocally that the fatal injuries were inflicted within minutes of the baby's death and no contrary evidence was presented.

{¶ 35} We cannot say here that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that Nelson's conviction must be reversed and a new trial ordered. This is not the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 36} We find Nelson's second assignment of error not well-taken.

### III. Conclusion

{¶ 37} Counsel's decision not to cross-examine the deputy coroner as to the length of time A.P.'s brain was fixed in formalin before it was sectioned for microscopic examination, and the decision not to consult an expert on this issue, constituted trial strategy that does not support a claim of ineffective assistance of counsel. We find Nelson's first assignment of error not well-taken.

{¶ 38} The autopsy results showed that A.P.'s fatal injuries were inflicted minutes before her death and Nelson was the only adult who was with A.P. in the minutes leading up to her death. Although there was evidence of older injuries, the undisputed evidence was that those injuries did not cause A.P.'s death. We find that Nelson's conviction was not against the manifest weight of the evidence. We find his second assignment of error not well-taken.

15.

**{¶ 39}** We affirm the March 22, 2022 judgment of the Lucas County Court of Common Pleas.  Nelson is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.