IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36270-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SIMON C. STOTTS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — We must decide whether a MedTox scan analyzer that tests urine for the presence of drugs must meet the *Frye* test and whether a manufacturer's disclaimer on the test results sheet renders the results untrustworthy and inadmissible. We hold that the scan analyzer's immunoassay process need not undergo a *Frye* hearing because of its general acceptance in the scientific community. We further hold that the disclaimer did not injure the reliability of the drug screen's results to the extent of rendering the results inadmissible. We affirm Simon Stotts' conviction for assault of a child in the third degree.

## FACTS

Simon Stotts and his partner, Talonna Baldwin, drove Baldwin's three-year-old niece, Allison, from the child's grandmother's home in Republic to Allison's home in

Colville.  Allison is a pseudonym.  Allison slept during the hour long forested ride from Republic to Colville.

Allison encountered her great aunt, Karen Jones, on returning home.  According to Jones, Allison acted unusually because Allison showed no excitement.  Typically, Allison hugged Jones when Allison returned home, but Allison lethargically walked to the couch and sat.  Jones asked Allison for an embrace, but Allison remained couchsitted and complained about a "headdit," three-year-old speak for a headache.  Report of Proceedings (RP) at 139.  Jones observed Allison having dilated pupils.  RP 140.  Allison commented that "Auntie Nona" (Talonna Baldwin) and Simon Stotts had smoked in the car and the smoke smelled "like Diva's pee."  RP at 140-41.  Diva is Karen Jones' cat.  Allison expressed a wish to die from her pain.

Karen Jones and Allison's uncle, Devin Casey, drove Allison to Colville's Mount Carmel Hospital.  Emergency room physician Dr. Sally Sartin examined Allison at the hospital.  Allison complained of a stomach ache and feeling "weird all over."  RP at 219.  Dr. Sartin ordered a urine drug screen test for Allison.  The hospital's medical technologist Jodie Murrell-Scott performed an immunoassay test, on the urine sample, with a MedTox scan analyzer.  The test result sheet contained the following language:

> This entire battery is for screening purposes only.  Results are not confirmed.  Please note: Some medications cause positive results with any

or all tested drugs in this battery. Results from any unconfirmed drug in this screening battery should not be used for legal purposes.

Clerk's Papers (CP) at 5; Exhibit 1. The drug screen found opiates in Allison's urine. As a result, Sartin opined that someone exposed three-year-old Allison to opioids.

PROCEDURE

The State of Washington charged Simon Stotts with assault of a child in the third degree or, in the alternative, reckless endangerment. The State charged Talonna Baldwin with the same crimes, and the charges against both Stotts and Baldwin proceeded during the same trial.

During discovery, Simon Stotts asked the State to disclose the following information: the name of the instrument used to detect opiates in Allison's system, the maintenance records for the urine screening instrument, the manual for the instrument, and the name of the individuals who collected Allison's sample and tested the sample. The State did not respond to the discovery request. Stotts does not complain about the failure on appeal.

Before trial, Simon Stotts brought a motion, under *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923) and ER 702, to suppress evidence of the results of the MedTox scan analyzer urine drug screen. Stotts highlighted the language on the test result sheet that declaimed: "Results are not confirmed." "Some medications cause

positive results with any or all tested drugs in this battery."  "Results from any

unconfirmed drug in this screening battery should not be used for legal purposes."  CP at

5; Exhibit 1.  Stotts also argued for suppression on the basis that the State failed to answer

the discovery request.  The State responded that the disclaimer on the screening test went

to the weight, not admissibility, of the results.  The trial court reserved a ruling on the

motion to suppress until trial.

After the commencement of trial, Simon Stotts asked for a *Frye* hearing as to the

admissibility of the urine test results for Allison.  In response, the trial court directed the

State to question the medical technologist for the purpose of laying a foundation for the

admissibility of the drug screen results.

Outside the presence of the jury, the State presented the testimony of Mount

Carmel Hospital medical technologist Jodie Murrell-Scott.  Murrell-Scott holds a

bachelor's degree in biology.  She has served as a medical technologist since 2003 and

has received training using the drug screen test instrument, a MedTox scan analyzer,

which generated the results from the testing of Allison's urine.  The analyzer performs an

immunoassay test on urine samples.  The hospital uses the test results for medication

compliance and diagnosis and treatment of patients.  The analyzer is the only machine

available to run drug screen tests at the hospital.

Jodie Murrell-Scott testified that she had operated the MedTox scan analyzer for more than one year. Murrell-Scott passed a competency examination to operate the MedTox machine.

Jodie Murrell-Scott testified about the testing of the MedTox scan analyzer by Mount Carmel Hospital before the hospital first operated the machine for patients:

> So our technical specialist and our medical director have to go through a rigorous correlation study, where they study—known samples and verify that this instrument is producing valid results, before we can actually go live.
> Then we also have to perform QC, quality control—and so once that happens and the medical director looks at the data then they would sign off—he signs off on it.
> . . . .
> Then we can start using it for medical purposes.

RP at 183. Hospital staff conducts quality control procedures on the MedTox instrument every week. The specialist always uses many samples to confirm the accuracy of the machine. To her knowledge, the drug screening machine has never failed a quality control test. Nevertheless, Murrell-Scott does not know the accuracy levels of the instrument or the likelihood of false positives. Physicians at Mount Carmel Hospital rely on the MedTox scan analyzer results when diagnosing and treating patients.

According to Jodie Murell-Scott, the hospital could send the urine sample to a laboratory in Spokane for additional analysis and confirmation. We do not know the

5

nature of the additional testing or the identity of the machine or machines used by the

Spokane lab. Murell-Scott has never sent a urine sample to Spokane for confirmation.

Jodie Murrell-Scott described the process she employs when a hospital employee

deposits a urine sample in the hospital laboratory. The State then asked Murell-Scott

about the written disclaimer printed at the end of the test results.

> Q. [THE STATE]: So, this—and on the results it says . . .
> "The entire battery is for screening purposes only. They are not—
> results are not confirmed, and results from any unconfirmed drug in a
> screening battery should not be used for legal purposes."
> Are you familiar with that at all, or is that not something you see.
> A. [MURRELL-SCOTT]: I have seen that, yes. That's a canned
> comment that goes on every patient result like that. So, I don't—But I
> don't pay attention to that because that's—that was built as part of the test.
> Q. [THE STATE]: Okay. . . . So  this is unconfirmed a second test. .
> . . What does "unconfirmed" mean.
> A. [MURRELL-SCOTT]: "Unconfirmed" means that this is initial
> screening, and if the provider would like it to be confirmed then we save the
> sample for thirty days, and then they—we would send it out to Sacred Heart
> and they would—I don't know if they send it on to—well, it used to be
> PAML, but LabCore bought them, so I don't know if they send it there. But
> that is our procedure; we would send it out.

RP at 185-86.

The trial court denied Simon Stotts' motion to suppress the urine test result. The

court reasoned that acceptance of the MedTox scan analyzer screen results did not require

a *Frye* test because the instrument did not employ new scientific principles. The trial

court emphasized that the treating physician, Dr. Sally Sartin, relied on test results when

6

diagnosing Allison's ailment. The lack of a later confirmation of the initial drug screening by the instrument went to the weight of the testimony and accuracy of the test result, not the admissibility of the evidence.

After the trial court's denial of Simon Stotts' motion to suppress, the jury heard testimony from medical technologist, Jodie Murrell-Scott. Murrell-Scott repeated much of the testimony rendered during the hearing to suppress. Murrell-Scott added that other hospitals also use the MedTox scan analyzer. She reiterated that she did not know the "uncertainty measurement" for the machine and she did not know how often false positives occur. RP at 214-15.

After the testimony of Jodie Murrell-Scott, the State called Dr. Sally Sartin, a board certified family medicine doctor, to testify. Dr. Sartin averred that Allison complained of a stomach ache and "feeling weird" when she visited Mount Carmel Hospital. RP at 219. Sartin ordered a urine drug screen because she concluded that Allison may have been exposed to drugs. In making her final diagnosis, she relied on the lab test results generated by medical technologist Murrell-Scott.

During the testimony of Dr. Sally Sartin, the State asked for admission of the urine test results for Allison. The trial court admitted the results as an exhibit.

Dr. Sally Sartin continued with her testimony during trial. Sartin explained that the MedTox scan analyzer screens for any possibility that a patient may be under the influence of drugs. Dr. Sartin confirmed that she uses the drug screen results for diagnosis purposes. According to Sartin, Mount Carmel Hospital never sends a positive urine sample of a patient to another facility for confirmation by more sensitive testing. When asked why not, Dr. Sartin replied:

> At that point I'm—usually not dealing with a—a legal circumstance. So, like I said, it was mainly for diagnosis purposes. I don't feel at that point that I need to send it out for confirmatory testing.

RP at 225. Dr. Sartin opined that Allison had likely been exposed to drugs, although Sartin could not rule out the possibility of a positive opiate result due to poppy seed consumption.

During their cases, neither Simon Stotts nor Talonna Baldwin presented testimony challenging the accuracy or accepted use of the MedTox scan analyzer by the medical community. Simon Stotts testified that he did not smoke drugs in the car on his way from Republic to Colville with Allison in the vehicle. Stotts' codefendant, Talonna Baldwin, also testified that no one smoked in the vehicle.

The trial court instructed the jury on the alternative charges of third degree assault of a child and reckless endangerment. The jury returned a verdict of guilty on the charge

8

of assault of a child in the third degree.  The trial court sentenced Simon Stotts to thirty days' confinement and twelve months of community custody supervision.

LAW AND ANALYSIS

On appeal, Simon Stotts renews his argument that the trial court should have excluded the urine drug test screen under the *Frye* test, *Frye v. United States*, 54 App. D.C. 46 (1923), and under ER 702.  Stotts emphasizes that Mount Carmel Hospital could have sent, but did not send, Allison's urine sample to another laboratory for confirmatory testing, and Stotts highlights the disclaimer language on the test results.  We address separately the *Frye* test and the evidence rule.

*Frye* Test

As a general rule, the trial court must exclude expert testimony involving scientific evidence unless the testimony satisfies both *Frye* and ER 702.  *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013).  Washington applies the *Frye* test to determine the admissibility of novel scientific evidence.  *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d 1304 (1996).  The *Frye* test comprises two prongs: (1) whether the scientific community accepts the underlying theory, and (2) whether techniques utilizing the theory produce reliable results.  *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d

43 (1994). The *Frye* test aims to exclude, from a trial, novel scientific evidence not accepted in the scientific community. *State v. Copeland*, 130 Wn.2d at 256.

*Frye* does not concern itself with the acceptance of the results of a particular study or the particular testing procedures followed in the case before the court. *State v. Russell*, 125 Wn.2d 24, 51, 882 P.2d 747 (1994). ER 702 addresses these concerns.

Washington courts apply the *Frye* test only to evidence involving new or novel scientific principles or new methods of proof. *State v. Baity*, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000); *State v. Noltie*, 57 Wn. App. 21, 29-30, 786 P.2d 332 (1990), *aff'd*, 116 Wn.2d 831, 809 P.2d 190 (1991). We principally rely on this rule when affirming the trial court's declination of a *Frye* hearing. In *State v. Noltie*, the court held *Frye* does not apply to colposcopic evidence because the general medical community employs the evidence and the evidence is no more "novel" than binoculars. Even though its use in child abuse cases was relatively recent, this court held *Frye* did not apply.

Neither party cites case law regarding urinalysis and its use or admissibility of results. Although not cited by either party, the 2002 case, *People v. Nolan*, 95 Cal. App. 4th 1210, 116 Cal. Rptr. 2d 331 (2002), helps. We adopt the reasoning from *People v. Nolan*.

In *People v. Nolan*, a court order demanded that Jennifer Nolan participate in a drug court program as part of probation. Nolan submitted a urine sample to her program coordinator, which sample tested positive for marijuana. At Nolan's probation revocation hearing, the program coordinator testified he used an ADx Abbott Bench Analyzer to test the urine sample. Nolan's counsel objected to the admissibility of the results under *Frye*.

On appeal, Jennifer Nolan targeted the ADx Analyzer device as novel, and she argued that its results were inadmissible. The California appellate court declined to decide whether the *Frye* test applied to probation revocation hearings. Instead, the court ruled that the bench analyzer did not employ a new scientific technique. The court declared urinalysis to be a medically accepted and widely used method of drug testing. Both the ADx machine and the older enzyme immunoassay test use the well-accepted immunoassay scientific technique to detect drugs in urine. The court recognized that manufacturers will continue to market new instruments and devices, but, if those devices implement established scientific methods, a *Frye* hearing is not needed to introduce results from the new devices. *Frye* applies to new methodologies, not to new inventions that employ established techniques.

Mount Carmel Hospital utilized the MedTox scan analyzer, which employed immunoassay testing of urine similar to the ADx analyzer. Jodie Murrell-Scott, the

11

medical technologist, testified that the test results generated were relied on by medical professionals when diagnosing patients. Dr. Sally Sartin confirmed this testimony. Simon Stotts presented no contrary evidence that the MedTox scan analyzer utilized novel scientific methods.

Other foreign cases have held that the trial court need not conduct a *Frye* hearing before admitting urinalysis results. In *Somers v. State*, 368 S.W.3d 528 (Tex. Crim. App. 2012), the court held that the enzyme-multiplied immunoassay technique test, probably a forerunner to MedTox scan analyzer's immunoassay testing, suffices as reliable scientific evidence, with or without a confirmation test, for purposes of determining admissibility of test results. In *State v. Leep*, 212 W. Va. 57, 569 S.E.2d 133 (2002), the court also held admissible the results immunoassay tests performed on a child in a prosecution against the parent for sexual assault. The results showed that the child suffered from chlamydia, a sexually transmitted disease. The court deemed the results reliable and relevant. The accused could challenge the weight and credibility of test results through cross-examination and rebuttal.

At least one case entails the use of a MedTox device, although the decision did not directly address the admissibility of test results from the device. In *State v. Weaver*, 178 Ohio App. 3d 504, 2008-Ohio-5022, 898 N.E.2d 1023, the appellate court affirmed a

conviction of a parent for poisoning her minor son. The conviction turned in part on

testing of the son's urine by a medical device produced by MedTox Laboratories.

ER 702

We now address the admissibility of the MedTox scan analyzer test results under

ER 702. ER 702 declares:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We review the trial court's decision to admit or reject evidence under ER 702 under an

abuse of discretion standard. *State v. Roberts*, 142 Wn.2d 471, 520, 14 P.3d 713 (2000).

Under an abuse of discretion standard, this appellate court will find error only when the

trial court's decision (1) adopts a view that no reasonable person would take and is thus

manifestly unreasonable, (2) rests on facts unsupported in the record and is thus based on

untenable grounds, or (3) was reached by applying the wrong legal standard and is thus

made for untenable reasons. *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942

(2012).

Expert or opinion evidence must satisfy a two-part inquiry under ER 702: (1) the

witness must qualify as an expert, and (2) the testimony must help the trier of fact. *State*

*v. Copeland*, 130 Wn.2d 244, 256 (1996). A witness may qualify as an expert "by

knowledge, skill, experience, training, or education." ER 702. Expert testimony is helpful to the trier of fact when it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury. *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). So long as helpfulness is fairly debatable, a trial court does not abuse its discretion in permitting the expert testimony. *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001).

As stated earlier, a *Frye* hearing does not seek to determine the admissibility of the results of a particular study or of particular testing procedures. *State v. Russell*, 125 Wn.2d at 51 (1994). The court instead addresses the reliability of the particular test at issue under an ER 702 analysis of whether expert testimony would help the trier of fact. *State v. Russell*, 125 Wn.2d at 51. If the testimony shows that the testing procedure performed was so flawed as to be unreliable, the trial court may exclude the testing results as unhelpful to the trier of fact. *State v. Russell*, 125 Wn.2d at 51. If the evidence survives an ER 702 challenge, the trier of fact may still consider challenges to the reliability of the testing when determining the weight to be given to the evidence. *State v. Russell*, 125 Wn.2d at 51; *State v. Cauthron*, 120 Wn.2d 879, 899, 846 P.2d 502 (1993).

Simon Stotts does not dispute the qualifications of medical technologist, Jodie Murrell-Scott, to testify as an expert. We also rule that Murrell-Scott's testimony aided

the jury in determining whether Simon Stotts smoked opiates in the presence of Allison.

Jodie Murrell-Scott described for the jury her own procedures for testing a urine sample at the hospital laboratory. She discussed the quality controls and the rigorous correlation studies conducted before the hospital began use of the MedTox scan analyzer. She did not deem it necessary to send the sample to Spokane for confirmation.

Simon Stotts astutely highlights the disclaimer embedded on the results sheet by the manufacturer of the MedTox scan analyzer, and he argues that the limiting language established the lack of reliability of the results for forensic purposes. No Washington case has addressed the admissibility of test results when the manufacturer of the test equipment warns the user that test results should not be used for legal purposes. Two foreign decisions hold that such a disclaimer does not preclude admission of the results. We adopt the reasoning of the two decisions. We consider the disclaimer the product of a finicky corporate manufacturer, who, while praising the accuracy of the device's screening results as part of its marketing scheme, attempts to shield itself from legal liability.

In *Stewart v. Manhattan & Bronx Surface Transit Operating Authority*, 30 A.D.3d 283, 817 N.Y.S.2d 51 (2006), the court addressed limiting language of test results indirectly. Mary Stewart sued a bus line for injuries sustained when a bus struck her.

15

Emergency personnel transported Stewart to the hospital, where technicians tested her

blood and produced a toxicology report showing a blood alcohol level of .20. At the end

of the toxicology report, beneath the data, the following language appeared:

> "These results are to be used for clinical evaluation only (and not for any legal or employment evaluative purposes). Confirmation testing was not performed."

30 A.D.3d at 283. The bus line asked the trial court to redact the language as lacking any

bearing on the legitimacy of the test results. The trial court refused. The jury found the

bus line seventy percent at fault and Stewart thirty percent at fault for the accident. The

appellate court reversed and remanded for a new trial. The appeals court deemed the

cautionary language irrelevant because the health care providers did not rely on the

language for diagnosis and treatment. The court found the error prejudicial because the

jury could have speculated in favor of Stewart as to the accuracy of the test result.

*Stewart v. Manhattan & Bronx Surface Transit Operating Authority* goes one step

beyond the State of Washington's request and Simon Stotts' trial court's ruling. The

State of Washington agreed that Stotts could mention to the jury the disclaimer language

in an attempt to impeach the urinalysis result. *Stewart* suggests that the State of

Washington could have successfully requested redaction of the language from exhibit 1,

the written test result, since Allison's treating physician did not rely on the language, even

assuming she read the disclaimer.  We do not adopt, however, *Stewart*'s holding that the warning language should not be seen by or mentioned to the jury.

*State v. Martin*, ___ So.3d ___, 2019 WL 180529 (Ala. Crim. App.), as its name suggests, was a criminal prosecution unlike *Stewart v. Manhattan & Bronx Surface Transit Operating Authority*.  The State of Alabama indicted Sylvia Martin for chemical endangerment of her child.  Martin filed a pretrial motion to suppress the urine and meconium test results obtained by the hospital following the birth of her child.  The results included the language:

> "This is a medical urine drug screen and can only be used for treatment purposes.  These are unconfirmed screening results and must not be used for non-medical purposes such as legal or employment testing."

___ So.3d ___, at *2 n.2.  The trial court granted the motion partly because of the limiting language.  The Alabama criminal appellate court reversed the exclusion of the test results.  The court held that the test results' disclaimer did not bar introduction of the results as evidence.  Instead, the State should be afforded the opportunity to present a foundation for admission of the evidence.

In his appeal brief, Simon Stotts cites an article from the Mayo Clinic and the Drug Testing Legal Manual.  Both publications mention that many clinicians agree positive presumptive results of screening tests, standing alone, lack the validity necessary for use

in strictly forensic applications. Instead, according to the publications, the results must be confirmed by adequate alternative chemical analyses before any weight should be placed on positive findings. Accordingly, Stotts contends that unconfirmed drug results, like Allison's, are prejudicial, misleading, and obfuscate the issue for the trier of fact.

We conclude that Stotts should have presented his literature at trial, through a qualified expert who considers the publications authoritative. Such testimony could have been admitted to impeach the weight of the MedTox scan analyzer test results.

Statement of Additional Grounds for Review

Simon Stotts raises two additional arguments in a statement of additional grounds. First, Stotts contends his lawyer misrepresented that Stotts need not worry because he would win at trial. Second, citing to page 105 of the report of proceedings, Stotts writes that Dr. Sally Sartin did not collect Allison's urine sample and did not conduct the immunoassay. Stotts also emphasizes that Sartin testified that poppy seed muffins could cause a positive test for opiates.

Simon Stotts fails to inform the court as to why his factual contentions require a reversal. Although RAP 10.10(c) does not require the appellant to refer to the record or cite authority, he must still "inform the court of the nature and occurrence of [the] alleged errors." We, therefore, deny his statement of additional grounds.

18

No. 36270-1-III
*State v. Stotts*

CONCLUSION

We affirm the trial court's admission of the MedTox scan analyzer urine test results as an exhibit. We affirm the conviction of Simon Stotts for assault of a child in the third degree.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____          _____
Lawrence-Berrey, C.J.                                      Korsmo, J.